Trenton R. Kashima (SBN 291405)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
402 West Broadway, Suite 1760
San Diego, CA 92101
Tel: (619) 810-7047
Email: *tkashima@milberg.com*

Laurence D. King (SBN 206423)
**KAPLAN FOX & KILSHEIMER LLP**
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Tel: (415) 772-4700
Email: *lking@kaplanfox.com*

*Co-Lead Interim Class Counsel for Plaintiffs and the Class*

[Additional Counsel Appear on Signature Page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| In re: Nestle Boost Nutritional Drink Litigation | Case No.: 4:21-cv-09812-PJH |
|---|---|
| | **CONSOLIDATED CLASS ACTION COMPLAINT** |
| | **JURY TRIAL DEMANDED** |

Case No. 4:21-cv-09812-PJH

**NATURE OF THE ACTION**

1.      This is a civil class action brought individually by Plaintiffs on behalf of consumers who purchased the following of Defendant's Products: (1) BOOST Glucose Control, and (2) BOOST Glucose Control High Protein (collectively, the "Products").

2.      The Products are sold online and in stores throughout the United States including at mass retailers such as Amazon.com, Walmart, Target, CVS, and on Nestle's own website.

3.      The Products are sold in bottles that prominently represent on the bottles themselves that the Products "help manage blood sugar," and that they are "designed for people with diabetes." The name of the Products themselves, BOOST Glucose Control, is also a representation that it controls glucose. The main difference between BOOST Glucose Control and Glucose Control High Protein is the level of protein, which is 16 grams and 22 grams, respectively.

4.      The advertising makes express or implied health claims which require prior testing and approval by Food and Drug Administration ("FDA"), which Nestle has not obtained. Because Nestle has not obtained approval from the FDA, the Products are misbranded, and should not have been sold to the public.

5.      Defendant's express representations that the Products control glucose and are designed for diabetics are deceptive. Defendant's representations are reasonably understood by consumers, and were understood by Plaintiffs, to mean that the Products would have some affirmatively therapeutic impact on their blood glucose levels, or otherwise mitigate, treat, or prevent prediabetes or diabetes. But Defendant's own clinical trial concluded that the Products were only associated with a lesser rise in glucose levels as compared to one other nutritional drink that was unidentified in the study, and, as discussed in more detail below, this is only because Boost Glucose Control drinks have less sugar. A reasonable consumer would understand from Nestle's representations that the Products "control" and "manage" glucose, and that they are designed specifically for diabetics. But this is not the case. Defendant's prominent and systematic mislabeling of the Products and its false and deceptive advertising form a pattern of unlawful and unfair business practices that harms the public and, if unstopped, could lead to substantial societal harm.

6.    Plaintiffs bring this suit to halt Defendant's unlawful sales and marketing of its Products and for damages they sustained as a result of the illegal sales and false and misleading marketing. Declaratory and injunctive relief is of particular importance given the likely consequences of Defendant's actions.

## PARTIES

7.    Plaintiff Bruce Horti is a resident and citizen of California in Contra Costa County.

8.    Plaintiff Sandra George is a resident and citizen of California in San Bernardino County.

9.    Plaintiff Steven Owen is a resident and citizen of New Jersey in Ocean County.

10.    Defendant Nestle HealthCare Nutrition, Inc. ("Nestle") is a Delaware Corporation with an entity address of 1007 US Highway 202/206 BLDG JR2, Bridgewater, New Jersey, 08807. Defendant markets, distributes, and retails its Products throughout the United States, including in California and in this District, through brick-and-mortar stores, and at through numerous retailers online.

## JURISDICTION AND VENUE

11.    This Court has personal jurisdiction over Defendant. Defendant purposefully avails itself of the California consumer market and distributes the Products to hundreds of locations within this District and thousands of locations throughout California, where the Products are purchased by consumers every day.

12.    This Court has original subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), explicitly provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed Plaintiffs class, any member of the Plaintiffs class is a citizen of a State different from any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs. Plaintiffs allege that the total claims of individual members of the proposed Classes (as defined herein) are well in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs.

13.    Venue is proper in this District under 28 U.S.C. § 1391(a). Plaintiff Horti lives in

and made purchases of Products in this District, substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading information regarding the nature, quality, and/or ingredients of the Products, occurred within this District and the Defendant conducts business in this District.

## FACTUAL ALLEGATIONS

14.    At all relevant times, Defendant has marketed its Products in a consistent and uniform manner. Defendant sells the Products in all 50 states on its website and through various distributors and retailers across the United States.

### Diabetes in the U.S.A.

- Type 1: this results when the body does not produce enough insulin, resulting in high levels of glucose in the blood. People with Type 1 diabetes are typically diagnosed as children and must take insulin externally to manage their condition. Type 1 diabetes accounts for 5%-10% of diabetes in the United States.[1]

- Type 2: accounting for 90%-95% of all diabetes cases, Type 2 diabetes develops typically later in life than Type 1, and results not from the body's lack of insulin but from the body's inability to keep blood sugar at normal levels using the insulin that is produced, often because of the body acquiring insulin resistance. *See e.g.*, *id*. Type 2 diabetes often, but not always, results from unhealthy weight.

- Gestational Diabetes: develops during pregnancy in pregnant women who have never had diabetes outside of pregnancy. The condition typically disappears after pregnancy. *See id*.

15.    Diabetes of all types are a serious disease whose damaging effects increase over time. Diabetes symptoms typically include frequent urination, thirst that is difficult to quench, hunger, blurred vision, fatigue, dry skin, slow healing sores, and more than the normal number of infections.

16.    Diabetes often leads to more serious symptoms including death from increased risks of cardiac events, or from organ failure. According to the U.S. Center for Disease Control (CDC) diabetes is a leading cause of death and serious health complications in the U.S., and rates of Type 2 diabetes in particular have been increasing rapidly in the United States. The CDC's website reports as follows:

- 34.2 million US adults (more than 10% of the entire population of the U.S.), have diabetes, and 1 in 5 of them don't know they have it.

---

[1] *See* https://www.cdc.gov/diabetes/basics/diabetes.html (last visited October 25, 2021).

- Diabetes is the seventh leading cause of death in the United States.

- Diabetes is the No. 1 cause of kidney failure, lower-limb amputations, and adult blindness.

- In the last 20 years, the number of adults diagnosed with diabetes has more than doubled.[2]

17. There has been significant reporting on the growing dangers of Type 2 diabetes in the general media over the past several years, leading to awareness of the disease among American consumers.

18. In addition to diagnosed diabetes, 88 million American adults (1-in-3 Americans) are "prediabetic," which the CDC defines as follows:

Prediabetes is a serious health condition where blood sugar levels are higher than normal, but not high enough yet to be diagnosed as type 2 diabetes. Approximately 88 million American adults—more than 1 in 3—have prediabetes. Of those with prediabetes, more than 84% don't know they have it. Prediabetes puts you at increased risk of developing type 2 diabetes, heart disease, and stroke.[3]

19. People with Type 2 diabetes typically are prescribed medications to control their blood glucose levels, while Type 1 diabetics typically also are prescribed insulin, often in combination with other medications:

You may be able to manage your diabetes with healthy eating and being active, or your doctor may prescribe insulin, other injectable medications, or oral diabetes medicines to help manage your blood sugar and avoid complications. You'll still need to eat healthy and be active if you take insulin or other medicines. It's also important to keep your blood pressure and cholesterol close to the targets your doctor sets for you and get necessary screening tests.[4]

20. While the mechanism of action among these prescription medications differs, all of them ultimately seek to control and manage blood glucose levels, because it is the level of glucose in the blood that defines diabetes: a diagnosis of diabetes, or prediabetes, is triggered by measuring the level of glucose in the blood.

21. Because insulin is expensive and must be either injected or fed into the body through a tube inserted into the abdomen, insulin is not the frontline medication for type 2 diabetes (or

---

[2] *See* https://www.cdc.gov/diabetes/basics/diabetes.html (last visited October 25, 2021).

[3] *See* https://www.cdc.gov/diabetes/basics/prediabetes.html (last visited October 25, 2021).

[4] *See* https://www.cdc.gov/diabetes/basics/type2.html (last visited October 25, 2021).

prediabetes), which accounts for some 95% of diabetes. Instead, the vast majority of diabetics treat their diabetes with medications whose mechanism of action is what the Products represent to do: control glucose levels.

22.     For example, Lantus, the best-selling diabetes medication (and the 5th best-selling medication worldwide), advertises its ability to control blood glucose as follows:

> If your doctor said it's time for insulin, it's important to understand your options. Insulin is a hormone made in your body. If your doctor mentioned insulin, it can mean your body is no longer making, or is having trouble using, its own insulin. Millions of people count on once-daily Lantus®, as well as other diabetes medicines made by Sanofi, to help lower their blood sugar. Learn more below, then talk to your doctor to find out which insulin treatment may be right for you.[5]

23.     Similarly, Farxiga, another top selling medication for Type 2 diabetes, represents that it is used to "improve blood sugar control along with diet and exercise."[6]

24.     One popular class of type 2 diabetes drugs are Alpha-glucosidase inhibitors, which lower blood glucose by delaying the breakdown of carbohydrates.[7]

25.     Accordingly, a reasonable consumer with diabetes or prediabetes understands that products and treatments, other than insulin, can be used to control and maintain healthy glucose levels, which is their principal concern. Put differently: a product does not have to be an insulin replacement to be considered a treatment for diabetes or prediabetes. Reasonable consumers also understand that for any given health condition there are commonly prescribed treatments and over-the-counter treatments. For example, consumers know there are over-the-counter pain killers, and prescription pain killers. The same holds true for gastrointestinal conditions, influenza, and countless other health issues.

26.     With the dramatic rise of diabetes and prediabetes, companies have tapped into consumer anxieties about avoiding the risks of developing diabetes or prediabetes and treating or mitigating its symptoms and progression. This action is brought because of Defendant's deceptive advertising and misbranding of an over-the-counter protein drink.

---

[5] https://www.lantus.com/new-to-insulin/starting-insulin (last checked October 25, 2021).

[6] https://www.farxiga.com/ (last checked October 25, 2021).

[7] https://my.clevelandclinic.org/health/articles/12070-oral-diabetes-medications (last checked July 7, 2022).

**Defendant Makes Improper Health Claims**

27.     Food manufacturers are required to comply with state and federal laws and regulations that govern the labeling of food products. Among these is the Food Drug & Cosmetic Act, 21 U.S.C. §§ 301, *et seq*. ("FDCA") and its labeling regulations, including those in 21 C.F.R. § 101.

28.     California's Sherman Law has expressly adopted the federal labeling requirements as its own and indicated that "[a]ll food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food regulations of this state." California Health & Safety Code § 110100.

29.     As alleged herein, Defendant has violated the FDCA, the Sherman Law, and consumer protection statutes.

30.     The Products are represented on the front of their labels to be "nutritional drink[s]." As such they are "food" pursuant to 21 U.S.C. § 321(f), and the products as a whole and their ingredients are "substances" pursuant to 21 C.F.R. § 101.14(a)(2), and Defendant therefore may not make health claims about the Products unless such claims are expressly reviewed and preauthorized by the FDA. *See* 21 C.F.R. 101.14(e). A product that makes unauthorized health claims is misbranded pursuant to 21 U.S.C. § 343(r). Pursuant to the California Sherman law, "[i]t is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded." Cal. Health & Saf. Code § 110760.

31.     Cal. Health & Safety Code § 110760 (Deering, Lexis Advance through Chapter 1100, 102, 103, 105-112, 114, 115, 117-123, 125-142, 145-160, 164, 173, 174, 177, 180-184, 276, 294, and 307 of the 2021 Regular Session, including all urgency legislation effective July 2, 2021 or earlier).

32.     A health claim is "any claim made on the label or in labeling of a food, including a dietary supplement, that expressly or by implication . . . characterizes the relationship of any substance to a disease or health-related condition." 21 C.F.R. § 101.14(a)(1). Substance "means a specific food or component of food. . . ." 21 C.F.R. § 101.14(a)(2). "Disease or health-related condition means damage to an organ, part, structure, or system of the body such that it does not

function properly . . . or a state of health leading to such dysfunctioning." 21 C.F.R. § 101.14(a)(5).

33.     The Products are foods, and diabetes is a disease and/or health-related condition.

34.     Defendant makes the following health claims right on bottles themselves and on the packaging of the multi-packed bottles:

- "Designed for people with diabetes" is an implicit or express health claim: it denotes a relationship between the drink and diabetes, and reasonable consumers could only understand this to mean that the Product does something salutary for the condition on the label.

- The name of the Product: "BOOST Glucose Control," is an implicit or express health claim because it purports to control a health-related condition, namely the inability to control glucose, which describes diabetes. Reasonable consumers could only understand this to mean that the Products do something salutary for the control of glucose levels.

- "Helps manage blood sugar"[8] is an implicit or express health claim because it purports to manage a health-related condition, namely the inability to normally manage glucose, which describes diabetes.

35.     The BOOST Glucose Control and BOOST Glucose Control High Protein are represented as follows on the bottles themselves:

/ / /

/ / /

/ / /

/ / /

/ / /

---

[8] It should be noted that blood 'sugar' levels and blood 'glucose' level are often used interchangeably by consumers. Indeed, glucose is a simple version of sugar which comes from food that is consumed. Accordingly, most reasonable consumers would understand the representation that a product "helps manage blood sugar" as a reference to controlling blood glucose levels, which is important to diabetics. This connection is only reinforced by Defendant's "Glucose Control" representations.

1
2
3
4
5
6
7
8
9
10
11
12
13
14




15   36.    The Products come in a variety of sizes and are commonly sold in multi-pack paper

16   containers. The multi-pack packaging contains the same representations as are also made on the

17   individual bottles enclosed:

18
19
20
21
22
23
24
25
26
27




28   37.    The Products represent that they are "designed for people with Diabetes." Plaintiffs

1  purchased Products and relied on the representation that it was "designed for people with diabetes,"

2  and on the representations that BOOST Glucose Control effectively controls glucose and helps

3  manage blood sugar—all representations which are made on the Products.

4      38.    It appears that Nestle may be in the process of transitioning away from making the

5  "designed for people with diabetes" representation. On its website, Nestle currently shows a graphic

6  indicating a "new look" for the Glucose Control Products, which shows that "designed for people

7  with diabetes" has been replaced with "helps manage blood sugar," which is independently

8  actionably deceptive as alleged herein:

9



26      39.    On the Walmart website, as of October 28, 2021, the "new look" packaging is

27  described as "coming soon."

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19



20    40.    Nestle has been selling the Products expressly for "people with diabetes" for a long

21  time and is specifically targeting the Products for people with diabetes. On the ubiquitous Google

22  search engine, searching for "BOOST Glucose Control" returns ads sponsored by Nestle as the top

23  search result on October 25, 2021, and October 26, 2021, respectively, which highlight prominently

24  that they are meant for diabetics, and evidence that Nestle is targeting the Products specifically to

25  people concerned about diabetes:

26    **BOOST Glucose Control® Drinks | Nutrition For**
    **Diabetics**
27    https://www.**boost**.com/**boost**/--

28

Ad Purchase **BOOST Glucose Control®** Online Today . Free Shipping Over $49.95. Comes With 16           g High-Quality Protein And 25 Vitamins & Minerals! **Types**: **BOOST**® Original, **BOOST**® High Protein, **BOOST** Plus®, **BOOST Glucose Control®**

## BOOST**®** Drinks For Diabetics | Tailored Nutrition

https://www.**boost**.com/**boost**/--

Ad Purchase **BOOST Glucose Control®** Online Today . Free Shipping Over $49.95. Comes With 16

G High-Quality Protein And 25 Vitamins & Minerals!

Gluten Free · Buy Online · Free Shipping Over $49.95 · Balanced Nutrition

**Types**: **BOOST®** Original, **BOOST**® High Protein, **BOOST** Plus®, **BOOST Glucose Control®**

41.    The "new look" packaging contains the same health claims, representing that the Products can be used for "glucose control" and that they "help[] manage blood sugar."

42.    When Defendant's claims are viewed in their totality, they are either explicitly or implicitly claiming to prevent disease and/or treat disease, which makes the Products attractive to people who wish to lower their risk of becoming diabetic or prediabetic, and is also attractive to those who are already diagnosed and wish to mitigate their diagnosed diabetes or diagnosed prediabetes.

43.    The *sine qua non* of diabetes is the body's inability to properly manage blood glucose. A nutritional drink that claims to manage and control blood glucose levels, particularly one that also represents that it is "designed for people with diabetes," is making a health claim. As demonstrated above, the glucose control claims on the Products closely match the language in advertisements for FDA approved prescription diabetes medications.

44.    Pursuant to FDA regulations, express or implied health claims must be specifically preauthorized by the FDA. *See* 21 C.F.R. § 101.14(e). The health claims made by Defendant were not authorized and are therefore misbranded pursuant to 21 U.S.C. § 343(r).

45.    Nestle's chosen placement of the Products in stores and on websites enforces the conclusion that Nestle and/or the retailers selling the Products claim the Products treat health conditions, and that this is what they want consumers to believe.

1   46.   For example, on CVS.com, BOOST Glucose Control is categorized under the

2   following tabs: Home>Shop>Home Health Care>Diabetes Care>Nutrition & Food:



16   47.   The WalMart in Martinez, California, where Plaintiff Horti purchased BOOST

17   Glucose Control, houses the Products in Aisle D4. This is the same aisle that sells blood glucose

18   monitoring systems.

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

BOOST

**BOOST High Protein Ready to Drink Nutritional Drink, Rich Chocolate Protein Drink, 6 - 8 FL OZ Bottles**

★★★★⯨ (4.5) 1241 reviews

**$9.52** 19.8 ¢/fl oz

Prices may vary online, in stores, and in-app ⓘ

**Add to cart**

Count Per Pack: 6

| 6<br>$9.52<br>19.8 ¢/fl oz | 12<br>$18.20<br>19.0 ¢/fl oz | 24<br>$40.49 |
|---|---|---|

🏬 Pickup, **today** at Martinez Store
📍 Aisle D4

ReliOn

**ReliOn Premier Blood Glucose Test Strips, 50 Count**

★★★★⯨ (4.7) 410 reviews

**$9.00**

Prices may vary online, in stores, and in-app ⓘ

**Add to cart**

🏬 Pickup at Martinez Store
📍 Aisle D4

🛒 Delivery from store Check eligibility

🚚 Shipping, **arrives by tomorrow** to Martinez, 94553

✳️ Sold and shipped by Walmart.com

⟳ Not returnable Details

48.     Although the Products are sold in stores that also sell groceries, the Products are not sold in the grocery aisles. They are sold in the health and nutritional supplement sections, which adjoin aisles selling over the counter medications and other FDA-approved treatments, and diabetes diagnostic tests.

**Nestle Did Not Secure The Requisite FDA Pre-Authorization
to Make the Diabetes-Related Health Claims Appearing on the Products.
The Products are Therefore Misbranded. The Products Misleadingly Represent that
they were Designed for People with Diabetes and Control and Manage Blood Glucose**

49.     As alleged above, the Products purport to control blood glucose via representations on the bottle seen by anyone who buys it. The name of the Products, "Boost Glucose Control" represents prominently that the Products control glucose, which is reinforced by the separate representation that they "help[] manage blood sugar."

50.     Representations that a product controls glucose and "helps manage blood sugar" convey to a reasonable consumer that the Products affirmatively do something to control blood sugar: that whatever one's blood glucose is at the time they take the Products, drinking the Products will make it better. This is the way in which Plaintiffs and all other Class members reasonably understood the representation.

51.    Moreover, "designed for people with diabetes" reasonably conveyed to Plaintiffs that the Products were scientifically formulated to have some mechanism of action that provides a therapeutic benefit regarding diabetes/prediabetes.

52.    Although each of the representations standing alone are actionably deceptive, taken together, which is how Plaintiffs and consumers experience these prominent statements on the front of the products, they convey a clear and unmistakable message: if you are concerned about diabetes, this product will benefit you by acting on the underlying biological deficiency that defines diabetes by controlling your blood glucose levels.

53.    But this reasonable understanding is materially false and misleading, as demonstrated by the clinical study that Nestle discusses on a part of its website:

> BOOST Glucose Control® Drink is clinically shown to produce a lower blood sugar response vs. a standard nutritional drink in people with type 2 diabetes. Not a substitute for medication.

54.    Nestle's claims that the Products controls blood glucose is ostensibly backed by a single clinical study which compared the glucose response of just 12 people with type 2 diabetes after drinking "BOOST Glucose Control® Nutritional Drink" and after drinking an unidentified "standard oral nutritional supplement" (ONS). The study abstract does not say that BOOST Glucose Control High Protein were also tested. The study was done by the Nestle Nutrition Institute, which, upon information and belief, is funded by and/or directly or indirectly affiliated with defendant Nestle. BOOST Glucose Control is described in the study as a "Diabetes Specific Oral Nutritional Supplement (DS-ONS)." The study concluded that the rise in glucose levels was lower when the subjects drank the Products versus the ONS. According to the Abstract Summary for the Products (Exhibit A), the conclusions are:

> Conclusions:
>
> DS-ONS attenuated the overall blood glucose response and produced lower postprandial blood glucose peaks compared to a standard ONS.
>
> Specially formulated DS-ONS can be a useful tool to provide nutritional support as part of an overall diabetes management plan in individuals with T2D.

Exhibit A.

55.    According to the study, the DS-ONS—BOOST Glucose Control—caused blood

1    glucose levels to go up.

2        56.    Accordingly, contrary to the representations on each of the Products, Nestle BOOST

3    (let alone BOOST High Protein which was not tested) does not control glucose in a way that such

4    claim is reasonably understood. Instead, it simply provokes a less bad glucose response than some

5    other, unidentified product.

6        57.    Leaving aside whether the conclusions of this small (12 person), non-double-blind

7    study are scientifically valid, taking the conclusions at face value at most shows that BOOST

8    Glucose Control leads to a smaller glucose spike than a single, unidentified nutritional drink.

9        58.    A lowered glucose response can be achieved by lowering the sugar content. While

10   Plaintiffs cannot know what unidentified ONS was compared against the Products, Nestle makes

11   several drinks including Original BOOST, which contains 20 grams of sugar as compared with 4

12   grams of sugar for BOOST Glucose Control. Even if this was the only difference between Original

13   BOOST and BOOST Glucose Control, the latter would produce a lesser glucose spike.

14       59.    Plaintiffs and Class members bought the Products because they believed that the

15   Products were scientifically designed to control glucose level for people concerned about keeping

16   their blood glucose levels in control but received a product that simply has less sugar compared to

17   some other, unidentified product.

18       60.    Plaintiffs and all other Class members did not understand, and could not have

19   understood reasonably, that when Nestle advertised BOOST Glucose Control as "designed for

20   people with diabetes," and "helps manage blood sugar" all it meant is that the product has less sugar

21   than some other product (which was not identified to them) and would therefore cause less of a

22   glucose spike than those higher sugar products. That this is Nestle's rationale in support of the

23   Products is apparent from the study, and also from Nestle's brief supporting its motion to dismiss

24   the Second Amended Complaint: "a reasonable consumer would understand that BOOST Glucose

25   Control is not promising to cure diabetes, but instead is informing the consumer that the product

26   has fewer carbohydrates and less sugar and therefore will have a comparatively lower effect on

27   blood sugar levels than other comparable drinks containing more carbohydrates." ECF No. 15 at 5.

28       61.    Nestle's marketing is designed to play on reasonable consumer expectations based

on consumer experiences with packaged nutritional foods, which rarely feature the names of diseases or the underlying mechanism of diseases. When consumers see the name of a disease on a nutritional product, they reasonably expect that the product has received regulatory approval, or, if not, has been rigorously tested for efficacy, like other products that make health claims, including over the counter medications. Moreover, the marketing of "reduced sugar" "reduced calorie" or "diet" is ubiquitous, and these are never marketed to provide diabetes benefits. Diet Coke is not advertised as "diabetic glucose control Coke," and there is no "Pepsi Diabetes." With tens of millions of Americans diagnosed with diabetes or prediabetes, and millions more who are apprehensive about getting diabetes or prediabetes, the consumer diabetes market is enormous and presents clear potential for profit. If companies could legally market nutritional products expressly to diabetics just by lowering the sugar content, stores would be filled with such products. They are not because FDA regulations do not allow it (21 C.F.R. § 101.14(a)(1)), and because to do so would be misleading. While average consumers do not know the specific regulations that account for the non-existence of disease-names on nutritional products, they experience the effects of the regulations when they shop. The absence of diabetes-marketing on low sugar or diet products conditions consumers to reasonably expect that a product that expressly markets itself to diabetics has scientifically proven ingredients that support the marketing, not that it is simply lower in sugar.

62.    Indeed, federal regulators have adopted similar stances. In 2021, the Federal Trade Commission ("FTC") and FDA sent several cease-and-desist letters to companies suspected of advertising unproven treatments or cures for diabetes.[9] In these letters, the FDA and FTC state that reasonable consumers could interpret the following statements to be claims that a product treats the symptoms and causes of diabetes:

- "DIABETES SUPPORT (your product name)" with combined with the statements "Diabetes is caused when the body either resists insulin or does not produce enough; either of which can lead to unbalanced blood glucose levels. Our diabetes support formula assists in keeping blood sugar at an optimum level. ..... Diabetes Support helps to balance blood glucose levels"

---

[9]    https://www.ftc.gov/news-events/news/press-releases/2021/09/ftc-sends-cease-desist-demands-10-companies-suspected-making-diabetes-treatment-claims-without (last visited July 14, 2022).

and "May help balance Blood Sugar Levels."[10]

- "Diabalance Diabetes Supplement" (Product name) with combined with the statements "The key ingredients are a helpful aid to people who have diabetes and hypoglycemia," "IDEAL FOR ANY DIABETIC SUPPLIES KIT - Carry with you to remember to take regularly, keep your blood sugar levels under control …"[11]

63.    The Products list many ingredients on the back panel, and it is reasonable for any consumer that chooses to read the ingredients to believe that the advertised diabetes benefits are a function of the combination of ingredients listed, not just that it is lower in sugar. The BOOST Glucose Control vanilla drink lists the following ingredients:

WATER, MILK PROTEIN CONCENTRATE, TAPIOCA DEXTRIN, CANOLA OIL, AND LESS THAN 2% OF FRUCTOSE, SOY PROTEIN ISOLATE, CALCIUM CASEINATE, SODIUM CASEINATE, INULIN (FROM CHICORY), VITAMINS AND MINERALS*, PARTIALLY HYDROLYZED GUAR GUM, SOY LECITHIN, SALT, CELLULOSE GEL AND GUM, NATURAL AND ARTIFICIAL FLAVOR, CARRAGEENAN, SUCRALOSE

*VITAMINS AND MINERALS: POTASSIUM CITRATE, CALCIUM PHOSPHATE, MAGNESIUM PHOSPHATE, SODIUM ASCORBATE, CHOLINE BITARTRATE, POTASSIUM CHLORIDE, FERROUS SULFATE, ASCORBIC ACID, DL-ALPHA TOCOPHERYL ACETATE, ZINC SULFATE, NIACINAMIDE, CALCIUM PANTOTHENATE, MANGANESE SULFATE, PYRIDOXINE HYDROCHLORIDE, RIBOFLAVIN, VITAMIN A PALMITATE, THIAMINE HYDROCHLORIDE, COPPER SULFATE, CHROMIUM CHLORIDE, FOLIC ACID, POTASSIUM IODIDE, VITAMIN K1, SODIUM SELENITE, BIOTIN, VITAMIN D3, SODIUM MOLYBDATE, VITAMIN B12

64.    Defendant's false, deceptive, and misleading label statements violate 21 U.S.C. § 343(a)(1) and statutes adopted by many states deeming food misbranded when "its labeling is false or misleading in any particular."

[10] https://www.ftc.gov/system/files/warning-letters/warning-letter-ar-rahmah_pharm_llc.pdf (last visited July 14, 2022).

[11] https://www.ftc.gov/system/files/warning-letters/warning-letter-metamune_inc.pdf (last visited July 14, 2022).

65.     Defendant's false, deceptive, and misleading label statements are unlawful under State Unfair and Deceptive Acts and Practices Statutes and/or Consumer Protection Acts, which prohibit unfair, deceptive, or unconscionable acts in the conduct of trade or commerce.

66.     Further, as explained above, Defendant's claims are misleading to consumers in violation of 21 U.S.C. § 343, which states: "A food shall be deemed to be misbranded—False or misleading label [i]f its labeling is false or misleading in any particular."

67.     Under the New Jersey Administrative Code, New Jersey has expressly adopted the federal labeling requirements of the Act. Thus, a violation of federal labeling laws is an independent violation of New Jersey law and actionable as such.

68.     The California Sherman Law explicitly incorporates by reference "[a]ll food labeling regulations and any amendments to those regulations adopted pursuant to the FDCA," as the food labeling regulations of California Cal. Health & Saf. Code, § 110100, subd. (a). Thus, a violation of federal food labeling laws is an independent violation of California law and actionable as such pursuant to the "unlawful prong" of California's Unfair Competition Law ("UCL").

### Plaintiffs and Other Members of the Class Were Economically Damaged by Purchasing the Products

69.     Plaintiffs paid for products marketed as having therapeutic benefits to people concerned about diabetes by controlling glucose levels. They would not have purchased the Products without the diabetes-related misrepresentations, which were deceptive because the drinks were simply lower in sugar than some other, unidentified nutrition drink.

70.     In addition, because the Products made health claims that were not pre-approved by the FDA, they were misbranded and their sale was illegal: "[i]t is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded." Cal. Health & Saf. Code § 110760.

71.     Accordingly, Plaintiffs and other members of the Classes incurred economic damages equal to the entirety of the purchase price they paid for the Products.

72.     In the alternative to the foregoing, in the event Plaintiffs are not entitled to a refund of the full purchase price, their damages were equal to the premium they paid for the diabetes-

related misrepresentations.

73.    Nestle charges a premium for Boost Glucose Control products compared to its basic, non-diabetes related BOOST nutritional drink, and the product is sold at a premium at all retailers.

74.    For example, on Nestle's own site, a six-pack of the Nestle BOOST Original costs $7.95, while the BOOST Glucose Control six-pack sells for $9.49, a premium of 19.3%.

75.    Moreover, the premium paid by purchasers of BOOST Glucose Control on account of the diabetes-related misrepresentations is evident from a comparison of similar nutritional drinks:

| Product | Price Per Oz |
|---|---|
| Boost Glucose Control | $0.19/fl oz |
| Boost Original Nutritional Drink | $0.16/fl oz |
| Boost Women Nutritional Drink | $0.18/fl oz |
| Boost Men Nutritional Drink | $0.18/fl oz |
| Atkins Protein-Rich Shake | $0.12/fl oz |
| Quest Nutrition Ready to Drink Protein Shake | $0.18/fl oz |
| Premier Protein | $0.17/fl oz |
| Fairlife Nutrition Plan Shake | $0.04/fl oz |
| Equate Nutritional Shake Plus+ Complete Nutritional Drink | $0.15/fl oz |

76.    As shown above, when comparing the prices of Boost Glucose Control Products to other Nestle Boost products, it is clear that Defendant charges consumers a premium for "Glucose Control." Likewise, when comparing the price of Boost Glucose Control to other nutritional supplement drink products on the market, it is also clear that Defendant's selling price exceeds the benchmark price of what consumers would pay for nutritional supplement drinks if they were not looking for "Glucose Control" specifically.[12]

---

[12] *See* boost.com/products (for the "Boost Glucose Control," "Boost Original Nutritional Drink," "Boost Women Nutritional Drink," and "Boost Men Nutritional Drink" product prices) (last visited July 19, 2022); *see also* Amazon.com/ (searching for "Premier Protein Shake Strawberries; *see* Boost.com/ (Boost Glucose Control; Boost Original Nutritional Drink; Boost Women Nutritional Drink; Boost Men Nutritional Drink) (last visited July 19, 2022); *see also* Amazon.com/ (Premier Protein Shake; Quest Nutrition Ready to Drink Protein Shake; Atkins Protein Rich Shake) (last visited July 19, 2022); *see also* Walmart.com/ (Fairlife Nutrition Plan Shake; Equate Nutritional Shake Plus+ Complete Nutrition) (last visited July 19, 2022).

**PLAINTIFFS' EXPERIENCES**

**Bruce Horti**

77.    On or about March 10, 2020, Mr. Horti purchased the Boost Glucose Control Rich Chocolate and Very Vanilla flavors from a Costco in Concord, California, and a Walmart in Martinez, California, respectively. Mr. Horti had been diagnosed with prediabetes and was interested in reducing his risk of developing diabetes and ameliorating his prediabetes. Mr. Horti does not take medications for his prediabetes. Although the Products were more expensive than other choices he viewed, Mr. Horti chose to pay the premium price based upon the Products' diabetes-related representations (as identified above), including the representations that it controls and manages glucose levels. At the time of his purchase, Mr. Horti relied on Nestle's diabetes-related factual representations on the Products' label. Mr. Horti believed that the products he purchased would have some salutary benefit for diabetes and prediabetes. He did not believe that the touted diabetes benefits were simply a result of low sugar content. All of the diabetes-related representations made by Nestle regarding the Products purchased by Mr. Horti are false and misleading because Nestle did not receive FDA approval for such claims, and the claims viewed in their totality implicitly or explicitly claim to mitigate, treat, or prevent disease, and because the Products do not control or manage glucose levels. These claims, alone or in tandem, are deceptive and violate federal regulations.

**Sandra George**

78.    On or about September 20, 2021, Ms. George purchased the Boost Glucose Control-High Protein from a Walmart and CVS in Adelanto and Santa Fe Springs, California. Although the Products were more expensive than other choices she viewed, Ms. George chose to pay the premium price based upon the Products' diabetes-related representations (as identified above), including the representations that it controls and manages glucose levels. Ms. George is diabetic and takes two prescription medications for it. She bought the Products because she believed the Products would have a beneficial effect on her diabetes by controlling her glucose levels. Ms. George did not believe the Products would replace her prescription medications, but believed that because the drinks were advertised for diabetics and represented to control blood sugar, that they

would provide some salutary benefit for her diabetes. Ms. George did not understand that the Products were simply low sugar nutritional drinks. Indeed, Ms. George, used to purchase low-sugar and sugar-free protein drinks, but when she noticed the specific diabetes representations and purported glucose control benefits advertised on the Products, she stopped buying the other protein drinks which did not represent anything about diabetes specifically. At the time of her purchase, Ms. George relied on Nestle' diabetes-related factual representations on the Products' label. All of the diabetes-related representations made by Nestle regarding the Products purchased by Ms. George are false and misleading because Nestle did not receive FDA approval for such claims and the claims viewed in their totality implicitly or explicitly claim to mitigate, treat, or prevent disease, and because the Products do not control or manage glucose levels. These claims, alone or in tandem, are deceptive and violate federal regulations.

**Steven Owen**

79.    In or around April 2022, Mr. Owen purchased a 24-pack of Boost Glucose Control from Amazon for $38.99. Although the Products were more expensive than other choices he viewed, Mr. Owen chose to pay the premium price based upon the Products' diabetes-related representations (as identified above), including the representations that it controls and manages glucose levels. At the time of his purchase, Mr. Owen relied on Nestle's related factual representations on the Products' label. All of the diabetes-related representations made by Nestle regarding the Products purchased by Mr. Owen are false and misleading because Nestle did not receive FDA approval for such claims and the claims viewed in their totality implicitly or explicitly claim to mitigate, treat, or prevent disease, and because the Products do not control or manage glucose levels. These claims, alone or in tandem, are deceptive and violate federal regulations.

## CLASS ACTION ALLEGATIONS

80.    Plaintiffs bring this class action lawsuit on behalf of themselves and proposed Classes of similarly situated persons, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

81.    Plaintiffs seek certification of the following Classes:

**Nationwide Class**: All persons in the United States who purchased the

Products (the "Class" for personal use and not for resale.

**California Class**: All persons in the State of California who purchased the Products (the "California Subclass") for personal use and not for resale.

**New Jersey Class**: All persons in the State of New Jersey who purchased the Products (the "New Jersey Subclass") for personal use and not for resale.

82.     Members of the classes described are referred to as "Class Members" or members of the "Classes."

83.     The following are excluded from the Classes: (1) any Judge presiding over this action and members of his or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parent has a controlling interest (as well as current or former employees, officers, and directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

84.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

85.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1)**. The members of the Classes are so numerous that individual joinder of all Class Members is impracticable. On information and belief, Class Members number in the thousands to millions. The precise number or identification of members of the Classes are presently unknown to Plaintiffs but may be ascertained from Defendant's books and records. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

86.     **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**. Common questions of law and fact exist as to all members of the Classes, which predominate over any questions affecting individual members of the Classes. These common questions of law or fact include, but are not limited to, the following:

●       Whether the Products contents are mislabeled, and are being sold in violation

of the FDCA;

● Whether Defendant is explicitly or implicitly claiming that its Products can mitigate or prevent a disease or class of diseases in violation of the FDCA and DSHEA;

● Whether Defendant's Products are misbranded because their labelling fails to include adequate directions for use;

● Whether Defendant misrepresented and/or failed to disclose material facts concerning the Products;

● Whether Defendant knowingly made misleading statements in connection with consumer transactions that reasonable consumers were likely to rely upon to their detriment;

● Whether Defendant knew or should have known that the representations and advertisements regarding the Products was false and misleading;

● Whether Defendant's conduct violates public policy;

● Whether Defendant's acts and omissions violate California law;

● Whether Defendant's acts and omissions violate New Jersey law;

● Whether Plaintiffs and the Class Members did not receive the benefit of their bargain when purchasing the Products;

● Whether the Plaintiffs and the Class Members suffered monetary damages, and, if so, what is the measure of those damages;

● Whether Plaintiffs and the Class Members are entitled to an injunction, damages, restitution, equitable relief, and other relief deemed appropriate, and, if so, the amount and nature of such relief.

87.     Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and the other Class Members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

88.     **Typicality – Federal Rule of Civil Procedure 23(a)(3)**. Plaintiffs' claims are typical of the claims of the other Class Members because, among other things, all such claims arise out of the same wrongful course of conduct engaged in by Defendant in violation of law as complained of herein. Further, the damages of each Class Member were caused directly by Defendant's wrongful conduct in violation of the law as alleged herein.

89.     **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4)**. Plaintiffs are adequate representatives of the Classes because they are members of the Classes and their interests do not conflict with the interests of the Class Members they seek to represent. Plaintiffs have also retained counsel competent and experienced in complex commercial and class action litigation. Plaintiffs and their counsel intend to prosecute this action vigorously for the benefit of all Class Members. Accordingly, the interests of the Class Members will be fairly and adequately protected by Plaintiffs and their counsel.

90.     **Superiority – Federal Rule of Civil Procedure 23(b)(3)**. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
**California's Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200 et seq. ("UCL")**
**(On Behalf of Plaintiffs Bruce Horti, Sandra George, and the California Subclass)**

91.     Plaintiffs Bruce Horti, Sandra George, reallege ("Plaintiffs" for the purposes of this section) and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

92.     Plaintiffs bring this claim individually and on behalf of all members of the California Subclass against Defendant.

93.     The UCL prohibits any "unlawful, unfair or fraudulent business act or practice."

1    Cal. Bus. & Prof. Code § 17200.

2        94.    The acts, omissions, misrepresentations, practices, and non-disclosures of

3    Defendant as alleged herein constitute business acts and practices.

4        95.    Unlawful: The acts alleged herein are "unlawful" under the UCL in that they violate

5    at least the following laws:

6            (i)    The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.*;
                    as incorporated into California law in the Sherman Food, Drug, and
7                   Cosmetic Law, 20 Cal. Health & Safety Code §§ 110100, *et seq.*
                    Pursuant to California's Sherman law, "[i]t is unlawful for any
8                   person to manufacture, sell, deliver, hold, or offer for sale any food
                    that is misbranded." As alleged above, the Products are misbranded
9                   because they make unapproved health claims, and it was illegal for
                    Nestle to have sold them to Plaintiffs, who would not have purchased
10                  them if Nestle had followed the law. Accordingly, Plaintiffs are
                    entitled to damages equal to the entirety of what they paid for illegal
11                  products. Alternatively, Plaintiffs are entitled to the premium they
                    paid, as alleged above.
12
             (ii)   The False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et
13                   seq.*; and

14           (iii)  The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.*

15       96.    Unfair: Defendant's conduct with respect to the labeling, advertising, and sale of the

16   Products was "unfair" because Defendant's conduct was immoral, unethical, unscrupulous, or

17   substantially injurious to consumers and the utility of their conduct, if any, does not outweigh the

18   gravity of the harm to their victims.

19       97.    Defendant's conduct with respect to the labeling, advertising, and sale of the

20   Products was and is also unfair because it violates public policy as declared by specific

21   constitutional, statutory or regulatory provisions, including but not limited to the applicable sections

22   of the Consumers Legal Remedies Act, the False Advertising Law, the FDCA, and the California

23   Sherman Food, Drug, and Cosmetic Law.

24       98.    Defendant's conduct with respect to the labeling, advertising, and sale of the

25   Products was and is unfair because the consumer injury was substantial, not outweighed by benefits

26   to consumers or competition, and not one consumer themselves could reasonably have avoided.

27       99.    Fraudulent: A statement or practice is "fraudulent" under the UCL if it is likely to

28   mislead or deceive the public, applying an objective reasonable consumer test.

100.    As set forth in detail above, Defendant has fraudulently misbranded and mislabeled in violation of the FDCA and has made false and misleading statements that are likely to mislead reasonable consumers to believe the Products have been scientifically established to be effective, which they have not been.

101.    Defendant profited from its sale of the falsely, deceptively, and unlawfully advertised and packaged Products to unwary consumers.

102.    Plaintiffs and Class Members are likely to continue to be damaged by Defendant's deceptive trade practices, because Defendant continues to disseminate misleading information on the Products' packaging. Thus, injunctive relief enjoining Defendant's deceptive practices is proper.

103.    Plaintiffs and the California Class do not have an adequate remedy at law because damages alone will not stop Defendant's unlawful sale of the Products, as well as their misrepresentation or omissions. Damages will only address past injuries visited on Plaintiffs and the California Class. Defendant continues to misrepresent Products' health benefits. Only injunctive relief can prevent any future harm. This is particularly true because class members will not be able to readily determine if Defendant's Products truly provide the benefits advertised.

104.    Additionally, Plaintiffs seek restitution if monetary damages are not available. Indeed, restitution under the UCL can be awarded in situations where the entitlement to damages may prove difficult. *Cortez v. Purolator Air Filtration Products Co.*, 23 Cal.4th 163, 177 (2000) (Restitution under the UCL can be awarded "even absent individualized proof that the claimant lacked knowledge of the overcharge when the transaction occurred."); *Gutierrez v. Wells Fargo Bank, NA*, 589 F. App'x 824, 827 (9th Cir. 2014) (same); *Caro v. Procter & Gamble Co.*, 18 Cal. App. 4th 644, 661 (1993) ("In a suit arising under Business and Professions Code section 17200 et seq., the court 'is empowered to grant equitable relief, including restitution in favor of absent persons, without certifying a class action.'").

105.    But even if damages were available, such relief would not be adequate to address the injury suffered by Plaintiffs and the California Subclass. Unlike with damages, the Court's discretion in fashioning equitable relief is very broad. *Cortez*, 23 Cal.4th at 180. Thus, restitution

1    would allow recovery even when normal consideration associated with damages would not. *See,*

2    *e.g., Fladeboe v. Am. Isuzu Motors Inc*., 150 Cal. App. 4th 42, 68 (2007), as modified (Apr. 24,

3    2007) (noting that restitution is available even in situations where damages may not be available).

4        106.    Plaintiffs and California Class Members seek all monetary and nonmonetary relief

5    allowed by law, including restitution stemming from Defendant's fraudulent business practices;

6    declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure §

7    1021.5; injunctive relief and other appropriate equitable relief.

8    **COUNT II**
**California's False Advertising Law**
9    **Cal. Bus. & Prof. Code § 17500 ("FAL")**
**(On Behalf of Plaintiffs Bruce Horti, Sandra George, and the California Subclass)**
10

11        107.    Plaintiffs Bruce Horti and Sandra George reallege ("Plaintiffs" for the purposes of

12    this section) and incorporate by reference the allegations contained in the preceding paragraphs as

13    if fully set forth herein.

14        108.    Plaintiffs bring this claim individually and on behalf of the members of the

15    California Subclass against Defendant.

16        109.    The FAL provides that "[i]t is unlawful for any person, firm, corporation or

17    association, or any employee thereof with intent directly or indirectly to dispose of real or personal

18    property or to perform services" to disseminate any statement "which is untrue or misleading, and

19    which is known, or which by the exercise of reasonable care should be known, to be untrue or

20    misleading." Cal. Bus. & Prof. Code § 17500.

21        110.    It is also unlawful under the FAL to disseminate statements concerning property or

22    services that are "untrue or misleading, and which is known, or which by the exercise of reasonable

23    care should be known, to be untrue or misleading." *Id*.

24        111.    As alleged in detail above, the advertisements, labeling, policies, acts, and practices

25    of Defendant relating to the Products misled consumers acting reasonably as to the ingredients and

26    effectiveness of the Products.

27        112.    Plaintiffs suffered injury in fact as a result of Defendant's actions as set forth herein

28    because they purchased the Products in reliance on Defendant's labeling claims, which, under the

FDCA and DSHEA, amount to intentional mislabeling and misbranding of the Products.

113.    Defendant's business practices as alleged herein constitute deceptive, untrue, and misleading advertising pursuant to the FAL because Defendant has advertised the Products in a manner that is untrue and misleading, which Defendant knew or reasonably should have known, and omitted material information from its advertising.

114.    Defendant profited from its sale of the falsely and deceptively advertised Products to unwary consumers.

115.    Plaintiffs and the California Class do not have an adequate remedy at law because damages alone will not stop Defendant's unlawful sale of the Products, as well as their misrepresentation or omissions. Damages will only address past injuries visited on Plaintiffs and the California Class. Defendant continues to misrepresent Products' health benefits. Only injunctive relief can prevent any future harm. This is particularly true, as class members will not be able to readily determine if Defendant's Products truly provide the benefits advertised.

116.    Additionally, Plaintiffs seeks restitution if monetary damages are not available. Indeed, restitution under the UCL can be awarded in situations where the entitlement to damages may prove difficult. *Cortez*, 23 Cal.4th at 177 (Restitution under the UCL can be awarded "even absent individualized proof that the claimant lacked knowledge of the overcharge when the transaction occurred."); *Gutierrez*, 589 F. App'x at 827 (same); *Caro*, 18 Cal. App. 4th at 661 ("In a suit arising under Business and Professions Code section 17200 et seq., the court 'is empowered to grant equitable relief, including restitution in favor of absent persons, without certifying a class action.'").

117.    But even if damages were available, such relief would not be adequate to address the injury suffered by Plaintiffs and the California Subclass. Unlike damages, the Court's discretion in fashioning equitable relief is very broad. *Cortez*, 23 Cal.4th at 180. Thus, restitution would allow recovery even when normal consideration associated with damages would not. *See, e.g., Fladeboe*, 150 Cal. App. 4th at 68 (noting that restitution is available even in situations where damages may not be available).

118.    Plaintiff and California Class Members seek all monetary and nonmonetary relief

allowed by law, including restitution stemming from Defendant's fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief and other appropriate equitable relief.

**COUNT III**
**California's Consumer Legal Remedies Act**
**Cal. Civ. Code §§ 1750, *et seq*. ("CLRA")**
**(On Behalf of Plaintiffs Bruce Horti, Sandra George, and the California Subclass)**

119.    Plaintiffs Bruce Horti and Sandra George reallege ("Plaintiffs" for the purposes of this section) and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

120.    Plaintiffs bring this claim individually and on behalf of the members of the California Subclass against Defendant.

121.    Defendant is a "person" under the Legal Remedies Act, Cal. Civ. Code § 1761(c).

122.    Plaintiffs and Subclass members are "consumers" under the Legal Remedies Act, 18 Cal. Civ. Code § 1761(d).

123.    The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

124.    Defendant's false and misleading labeling and other policies, acts, and practices were designed to, and did, induce the purchase and use of the Products for personal, family, or household purposes by Plaintiffs and Subclass Members, and violated and continue to violate the following sections of the CLRA: 105. § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

125.    § 1770(a)(7): representing those goods are of a particular standard, quality, or grade if they are of another;

126.    § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

127.    § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

128.    Defendant profited from the sale of the falsely, deceptively, and unlawfully

- 29 -

advertised Products to unwary consumers.

129.    Defendant's wrongful business practices constituted, and still constitute, a continuing course of conduct in violation of the CLRA.

130.    Pursuant to the provisions of Cal. Civ. Code § 1782(a), on December 8, 2021, Plaintiff Horti mailed Defendant a letter prior to the filing of their First Amended Class Action Complaint providing notice of its alleged violations of the CLRA, demanding that Defendant correct such violations, and providing Defendant with the opportunity to correct its business practices.

131.    On January 11, 2021, Defendant responded to Plaintiffs' letter through counsel. However, Defendant did not take all the corrective action requested by Plaintiffs in their letter. Now, Plaintiffs bring claims for monetary relief, actual damages, and restitution under the Consumer Legal Remedies Act.

**COUNT IV**
**Unjust Enrichment**
**(In The Alternative And On Behalf Plaintiffs**
**and the Nationwide Class, New Jersey, and California Subclasses)**

132.    Plaintiffs repeat and re-allege the allegations above as if set forth herein.

133.    Plaintiffs bring this this claim individually and on behalf of the members of the Nationwide Class, or in the alternative the New Jersey, and California Subclasses against Defendant.

134.    Plaintiffs and Class Members conferred tangible and material economic benefits upon Defendant by purchasing Defendant's Products. Plaintiffs and Class Members would not have purchased the Products had they not relied upon Defendant's deceptive conduct and false advertising of the Products to help "control glucose" and "manage blood sugar."

135.    Defendant has been unjustly enriched in retaining the revenues derived from the purchase of the Products by Plaintiffs and the other members of the Classes.

136.    Retention of those monies under these circumstances is unjust and inequitable because Defendant's labeling of the Products was misleading to consumers, which caused injuries to Plaintiffs and the other members of the Classes, as they would have not purchased the Products

1    if Defendant had not misled them into believing the Products helped to "control glucose" and

2    "manage blood sugar…"

3        137.    Because Defendant's retention of the non-gratuitous benefits conferred on them by

4    Plaintiffs and the other members of the Classes is unjust and inequitable, Defendant must pay

5    restitution to Plaintiffs and the other members of the Classes for their unjust enrichment, as ordered

6    by the Court.

7    **COUNT V**
**Violation of the New Jersey Consumer Fraud Act, N.J.S. §§ 56:8-1, *et seq*.**

8    **(On Behalf of Plaintiff Steven Owen and the Nationwide Class and New Jersey Subclass)**

9        138.    Plaintiff Steven Owen ("Plaintiff" for the purposes of this section) repeats and

10    realleges each and every allegation contained above and incorporates by reference all other

11    paragraphs of this Complaint as if fully set forth herein.

12        139.    Plaintiff brings this cause of action individually and on behalf of the Nationwide

13    Class, or in the alternative, the New Jersey Subclass as defined above.

14        140.    This Count arises under the New Jersey Consumer Fraud Act, N.J. Stat. §§ 56:8-1,

15    et seq., and is brought on behalf of Plaintiff and members of the Classes pursuant to §§ 56:8-19 and

16    56:8-2.12 of the Act.

17        141.    Section 56:8-2 provides, in relevant part: "The act, use or employment by any person

18    of any unconscionable commercial practice, deception, fraud, false pretense, false promise,

19    misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with

20    intent that others rely upon such concealment, suppression or omission, in connection with the sale

21    or advertisement of any merchandise or real estate, or with the subsequent performance of such

22    person as aforesaid, whether or not any person has in fact been misled, deceived or damaged

23    thereby, is declared to be an unlawful practice . . . ."

24        142.    Plaintiff and other members of the Class and Subclass are consumers who purchased

25    the Products from Defendant pursuant to a consumer transaction for personal use and are, therefore,

26    subject to protection under the New Jersey Consumer Fraud Act, N.J.S. §§ 56:8-1, *et seq.*

27        143.    Defendant's acts, practices, misrepresentations, concealments, and omissions of

28    material facts in connection with the manufacture, advertising, marketing, and sale of the Products

1    are unlawful practices within the meaning of the New Jersey Consumer Fraud Act.

2        144.    Defendant engaged in unlawful practices by naming the Products "BOOST Glucose

3    Control," and representing that the Products: "Control Glucose," "MANAGE BLOOD SUGAR,"

4    and were "DESIGNED FOR PEOPLE WITH DIABETES." These representations are not true.

5        145.    Furthermore, as described herein, Defendant's false, deceptive and misleading label

6    statements violate 21 U.S.C. § 343(a)(1) and the statutes adopted by many states, which deem food

7    misbranded when "its labeling is false or misleading in any particular." Nestle did not receive FDA

8    approval for such claims and the claims viewed in their totality implicitly or explicitly claim to

9    mitigate and/or prevent disease.

10        146.    As a result of the use and employment by Defendant of the unlawful acts, Plaintiff

11    and the other Class Members have suffered an ascertainable loss of money or property and have

12    been damaged thereby.

13        147.    Under N.J.S. §§ 56:8-2.11, 56:8-2.1,56:8-19 and 56:8-159, Plaintiff and the other

14    Class Members are entitled to compensatory damages, including treble damages, attorneys' fees,

15    cost of suit, and declaratory relief.

16                                **COUNT VI**
                          **Breach of Express Warranty**
17            **(On Behalf of Plaintiffs and the Nationwide Class,**
                  **New Jersey, and California Subclasses)**
18

19        148.    Plaintiffs repeat and re-allege the allegations above as if set forth herein.

20        149.    Plaintiffs bring this cause of action individually and on behalf of the Nationwide

21    Class, or in the alternative, the New Jersey, and California Subclasses as defined above.

22        150.    Plaintiffs, and each member of the Classes, formed a contract with Defendant at the

23    time Plaintiffs and each member of the Classes purchased the Products.

24        151.    The terms of the contract include the promises and affirmations of fact made by

25    Defendant on the Products' packaging and through marketing and advertising, as described above.

26    This labeling, marketing, and advertising constitute express warranties and became part of the basis

27    of the bargain and are part of the contract between Plaintiff and the members of the Class and

28    Subclasses and Defendant.

152.    Defendant also made claims that were implied disease and health claims under FDCA regulations, which likewise breaches the warranties made by Defendant which Plaintiffs reasonably relied upon at the time of purchase.

153.    Plaintiffs and the members of the Classes performed all conditions precedent to Defendant's liability under this contract when they purchased the Products.

154.    Defendant breached express warranties about the Products and their qualities because Defendant's Products' representations purports the Products control blood glucose when it does not do so. The name of the Products, "BOOST Glucose Control" represents prominently that it controls glucose, which is reinforced by the separate prominent representation that it "HELPS MANAGE BLOOD SUGAR."

155.    Plaintiffs and each of the members of the Classes would not have purchased the Products had they known the Products did not "control glucose", "HELP[] MANAGE BLOOD SUGAR," or were not "DESIGNED FOR PEOPLE WITH DIABETES."

156.    Plaintiffs and members of the Classes relied upon the representations made by Defendant at the time of purchase and were deprived of the benefit of the bargain as a result of Defendant's conduct.

157.    As a result of Defendant's breach of warranty, Plaintiffs and each of the members of the Classes have been damaged in the amount of the purchase price of the Products and any consequential damages resulting from their purchases.

**COUNT IX**
**Breach of Implied Warranty of Merchantability**
**(On Behalf of Plaintiffs and the Nationwide Class,**
**New Jersey, and California Subclasses)**

158.    Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

159.    Plaintiffs bring this cause of action individually and on behalf of the Nationwide Class, or in the alternative, the New Jersey, and California Subclasses as defined above.

160.    Defendant marketed and sold the Products to function for the purpose of providing consumers products "DESIGNED FOR PEOPLE WITH DIABETES" that would "control

glucose" and "HELP[] MANAGE BLOOD SUGAR." Plaintiffs and Class and Subclass members purchased the Products for these reasons and the advertising and marketing stated above.

161.    Defendant's Products do not "control glucose" or "MANAGE BLOOD SUGAR," and do not otherwise help "PEOPLE WITH DIABETES" and thus render the Products unmerchantable and unfit for sale and use because they do not do what they were intended to do, as described above.

162.    Defendant was aware of the Products' defects at the time it sold them to Plaintiffs and Class and Subclass members. As a result of Defendant's breach of warranties, Class and Subclass members have suffered damages because they have purchased Products they would not have otherwise purchased and/or paid more for Products than they would have otherwise paid. Plaintiffs and Class and Subclass members are entitled to receive damages from Defendant in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this case be certified and maintained as a class action and for judgment to be entered against Defendant as follows:

A.    Enter an order certifying the proposed Class (and subclasses, if applicable), designating Plaintiffs as the class representative, and designating the undersigned as class counsel;

B.    Enter an order awarding Plaintiffs and the class members their actual damages, treble damages, and/or any other form of monetary relief provided by law;

C.    Declare that Defendant is financially responsible for notifying all Class Members of the mislabeling and misbranding of the Products;

D.    Declare that Defendant must disgorge, for the benefit of the Class, all, or part of the ill-gotten profits it received from the sale of the Products, or order Defendant to make full restitution to Plaintiffs and the members of the Class;

E.    Defendant shall audit and reassess all prior customer claims regarding the Products, including claims previously denied in whole or in part;

F.    An order awarding Plaintiffs and the Classes pre-judgment and post-judgment

1      interest as allowed under the law;

2      G.    Grant reasonable attorneys' fees and reimbursement of all costs for the prosecution

3            of this action, including expert witness fees; and

4      H.    Grant such other and further relief as this Court deems just and appropriate.

5                                    **JURY DEMAND**

6      Plaintiffs hereby demand a trial by jury on all issues so triable.

7                                    Respectfully submitted,

8      DATED: February 29, 2024          By: /s/ *Trenton R. Kashima*
                                              Trenton R. Kashima
9
                                         Trenton R. Kashima (SBN 291405)
10                                       **MILBERG COLEMAN BRYSON**
                                         **PHILLIPS GROSSMAN PLLC**
11                                       402 W. Broadway, Suite 1760
                                         San Diego, CA 92102
12                                       Telephone: (619) 810-7047
                                         Email: *tkashima@milberg.com*
13
                                         Alex Straus (SBN 321366)
14                                       **MILBERG COLEMAN BRYSON**
                                         **PHILLIPS GROSSMAN, PLLC**
15                                       280 s. Beverly Drive, Ste. PH
                                         Beverly Hills, CA 902126
16                                       Telephone: 865-247-0080
                                         Email: *astraus@milberg.com*
17
                                         Nick Suciu III (*pro hac vice*)
18                                       **MILBERG COLEMAN BRYSON PHILLIPS**
                                         **GROSSMAN, PLLC**
19                                       6905 Telegraph Rd., Suite 115
                                         Bloomfield Hills, MI 48301
20                                       Telephone.: (313) 303-3472
                                         Facsimile: (865) 522-0049
21                                       Email: *nsuciu@milberg.com*

22                                       J. Hunter Bryson (*pro hac vice*)
                                         **MILBERG COLEMAN BRYSON**
23                                       **PHILLIPS GROSSMAN PLLC**
                                         405 E. 50th Street
24                                       New York, NY 1002
                                         Telephone: (919) 539-2708
25                                       Facsimile: (919) 600-5035
                                         Email: *hbryson@milberg.com*
26

27

28

1    DATED: February 29, 2024          By: /s/ *Laurence D. King*
                                            Laurence D. King
2
                                       Laurence D. King (SBN 206423)
3                                      Matthew B. George (SBN 239322)
                                       Blair E. Reed (SBN 316791)
4                                      Clarissa Olivares (SBN 343455)
                                       **KAPLAN FOX & KILSHEIMER LLP**
5                                      1999 Harrison Street, Suite 1560
                                       Oakland, CA 94612
6                                      Telephone: 415-772-4700
                                       Facsimile: 415-772-4707
7                                      Email: *lking@kaplanfox.com*
                                            *mgeorge@kaplanfox.com*
8                                            *breed@kaplanfox.com*
                                            *colivares@kaplanfox.com*
9
                                       Joel B. Strauss (*pro hac vice*)
10                                     **KAPLAN FOX & KILSHEIMER LLP**
                                       800 Third Avenue, 38th Floor
11                                     New York, NY 10022
                                       Telephone: 212-687-1980
12                                     Facsimile: 212-687-7714
                                       Email: *jstrauss@kaplanfox.com*
13
                                       Michael D. Braun
14                                     **KUZYK LAW, LLP**
                                       1999 Avenue of the Stars, Ste. 1100
15                                     Los Angeles, CA 90067
                                       Telephone: 213-401-4100
16                                     Email: *mdb@kuzykclassactions.com*

17                                     Ross B. Rothenberg (to be admitted *pro hac vice*)
                                       **THE ROTHENBERG LAW FIRM LLP**
18                                     450 7th Avenue, 44th Floor
                                       New York, NY 10123
19                                     Telephone: 212-563-0100
                                       Email: *ross@injurylawyer.com*
20
                                       *Co-Lead Interim Counsel for Plaintiffs and the Proposed*
21                                     *Class*

22

23

24

25

26

27

28