1  Christopher Chorba, SBN 216692
   CChorba@gibsondunn.com
2  Perlette M. Jura, SBN 242332
   PJura@gibsondunn.com
3  Timothy W. Loose, SBN 241037
   TLoose@gibsondunn.com
4  GIBSON, DUNN & CRUTCHER LLP
   333 South Grand Avenue
5  Los Angeles, CA 90071-3197
   (213) 229-7746
6

7  Al Kelly (*pro hac vice*)
   AKelly@gibsondunn.com
   GIBSON, DUNN & CRUTCHER LLP
8  1801 California Street Suite 4200
   Denver, Colorado 80202
9  (303) 298-5700

10 *Attorneys for Defendant Nestlé Healthcare
   Nutrition, Inc.*

11

12

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

13 | IN RE: NESTLE BOOST NUTRITIONAL DRINK LITIGATION | Case No. 3:21-cv-09812-JSC |
14 | | **DEFENDANT NESTLÉ HEALTHCARE NUTRITION, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AS TO THE NAMED PLAINTIFFS** |

*[Proposed Order filed concurrently herewith]*

Date:        March 27, 2025
Time:        10:00 a.m.
Location:    Courtroom 8 – 19th Floor
Judge:       Hon. Jacqueline Scott Corley

Date Action Filed:  December 20, 2021

Gibson, Dunn &
Crutcher LLP

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on March 27, 2025, at 10:00 a.m., or as soon thereafter as the matter may be heard in the U.S. District Court for the Northern District of California, San Francisco Courthouse, Courtroom 8, 19th Floor, at 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Nestlé Healthcare Nutrition, Inc. ("Nestlé") will move under Federal Rule of Civil Procedure 56 for summary judgment as to the named Plaintiffs Sandra George, Bruce Horti, and Steven Owen, on the grounds that:

(1) Plaintiffs' sworn testimony demonstrates they were not deceived in the way alleged in their complaint, have suffered no financial injury, and have no standing;

(2) Plaintiffs' "misbranding" theory cannot support their claims as a matter of law because their argument misreads the applicable statutes and, in any event, does not provide an independent basis for standing in the absence of any concrete harm to Plaintiffs, specifically; and

(3) At a minimum, Plaintiffs do not have standing to seek injunctive relief because each of them admits they will not be deceived in the future and have no plans to buy the challenged products again, meaning they suffer no risk of imminent harm.

Because no class has been certified yet, Nestlé is entitled to seek summary judgment in its favor with respect to the claims of the named Plaintiffs. Should the Court later certify a class in this case, Nestlé reserves the right to seek classwide summary judgment, raising issues pertaining to the class that are not implicated by this narrower motion focused on named Plaintiffs' testimony and individual circumstances. *See Hoffman v. Tonnemacher*, 593 F.3d 908, 911 (9th Cir. 2010) ("[A] successive motion for summary judgment is particularly appropriate on an expanded factual record.").

This motion is based on this notice of motion and motion; the accompanying memorandum of points and authorities; the declaration of Timothy W. Loose and accompanying exhibits; all other documents on file in this action; and any oral argument of counsel.

DATED:  February 7, 2025

By: */s/ Timothy W. Loose*
Christopher Chorba, SBN 216692
CChorba@gibsondunn.com
Perlette M. Jura, SBN 242332
PJura@gibsondunn.com

Gibson, Dunn &
Crutcher LLP

i

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Timothy W. Loose, SBN 241037
TLoose@gibsondunn.com
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7746

Al Kelly (*pro hac vice*)
AKelly@gibsondunn.com
Gibson, Dunn & Crutcher LLP
1801 California Street Suite 4200
Denver, Colorado 80202
(303) 298-5700

*Attorneys for Defendant Nestlé Healthcare Nutrition, Inc.*

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................................... 1

I.  INTRODUCTION ................................................................................................................ 1

II.  BACKGROUND .................................................................................................................. 3

   A.  Boost Glucose Control is clinically proven to cause a lesser and more gradual rise in blood sugar, which is helpful for people with diabetes. ........................................ 3

   B.  The labeling and advertising of Boost Glucose Control accurately communicate the product's benefits. ................................................................................................ 5

   C.  Plaintiffs' complaint claims they thought Boost Glucose Control would always make their blood sugar "better," no matter what. ........................................................... 7

   D.  Discovery undermines all of Plaintiffs' claims. ............................................................. 9

III.  LEGAL STANDARD ......................................................................................................... 13

IV.  ARGUMENT ...................................................................................................................... 14

   A.  Plaintiffs' deposition testimony shows they suffered no injury. .................................... 14

     1.  Plaintiff Sandra George. ........................................................................................ 14

     2.  Plaintiff Bruce Horti. ............................................................................................. 16

     3.  Plaintiff Steven Owen. ........................................................................................... 18

   B.  Plaintiffs' "misbranding" theory does not provide an alternate basis for this case to continue. ..................................................................................................................... 20

     1.  The Boost labels do not make "health claims" under the FDCA. ......................... 20

     2.  Plaintiffs cannot sustain a lawsuit based solely on a regulatory violation. .......... 22

   C.  Plaintiffs do not have standing to seek prospective injunctive relief. ............................ 22

V.  CONCLUSION ................................................................................................................... 24

Gibson, Dunn &
Crutcher LLP

i

1

# TABLE OF AUTHORITIES

Page(s)

2

3      **Cases**

4      *Anderson v. Liberty Lobby, Inc.*,
           477 U.S. 242 (1986) ................................................................................................13

5

6      *Baghdasarian v. Amazon.com Inc.*,
           458 F. App'x 622 (9th Cir. 2011) ..........................................................................13

7      *Corbin v. Time Warner Ent.-Advance/Newhouse P'ship*,
           821 F.3d 1069 (9th Cir. 2016)..................................................................................2

8

9      *Davidson v. Kimberly-Clark Corp.*,
           889 F.3d 956 (9th Cir. 2018)..................................................................................22

10     *Doe v. SuccessfulMatch.com*,
           70 F. Supp. 3d 1066 (N.D. Cal. 2014) ...................................................................16

11

12     *Faulk v. Sears Roebuck & Co.*,
           2013 WL 1703378 (N.D. Cal. Apr. 19, 2013) ..................................................15, 16

13     *Golden v. Home Depot U.S.A., Inc.*,
           2020 WL 2571431 (E.D. Cal. May 21, 2020)..........................................................15

14

15     *Graham v. Cent. Garden & Pet Co.*,
           2023 WL 2744391 (N.D. Cal. Mar. 30, 2023) ........................................................23

16     *Hoffman v. Tonnemacher*,
           593 F.3d 908 (9th Cir. 2010)....................................................................................2

17

18     *Horti v. Nestlé Healthcare Nutrition, Inc.*,
           2023 WL 8613601 (9th Cir. Dec. 13, 2023) .............................................................9

19     *In re iPhone Application Litig.*,
           6 F. Supp. 3d 1004 (N.D. Cal. 2013) ......................................................................17

20

21     *Julian v. TTE Tech., Inc.*,
           2021 WL 810228 (N.D. Cal. Mar. 3, 2021)............................................................23

22     *Khasin v. Hershey Co.*,
           2014 WL 1779805 (N.D. Cal. May 5, 2014) ..........................................................17

23

24     *Lierboe v. State Farm Mut. Auto. Ins. Co.*,
           350 F.3d 1018 (9th Cir. 2003)..................................................................................2

25     *Magpayo v. Walmart Inc.*,
           2024 WL 4529343 (N.D. Cal. Oct. 18, 2024)..........................................................21

26

27     *Major v. Ocean Spray Cranberries, Inc.*,
           2015 WL 859491 (N.D. Cal. Feb. 26, 2015)..............................................14, 15, 20

28

Gibson, Dunn &
Crutcher LLP

1

2

# TABLE OF AUTHORITIES

Page(s)

3

4

*Major v. Ocean Spray Cranberries, Inc.*,
    690 F. App'x 564 (9th Cir. 2017) ...............................................................................17

*Matic v. United States Nutrition, Inc.*,
    2019 WL 3084335 (C.D. Cal. Mar. 27, 2019) .......................................................23, 24

5

6

*Moore v. Trader Joe's Co.*,
    4 F.4th 874 (9th Cir. 2021)............................................................................................18

7

8

*Moorer v. StemGenex Med. Grp., Inc.*,
    830 F. App'x 218 (9th Cir. 2020) ..................................................................................16

9

10

*Morizur v. Seaworld Parks & Ent., Inc.*,
    2020 WL 6044043 (N.D. Cal. Oct. 13, 2020)................................................................23

11

*Pac. Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*,
    992 F.3d 893 (9th Cir. 2021).........................................................................................13

12

*Red v. Kraft Foods, Inc.*,
    2011 WL 4599833 (C.D. Cal. Sept. 29, 2011)..............................................................15

13

14

*Romoff v. Gen. Motors LLC*,
    2023 WL 1097258 (9th Cir. Jan. 30, 2023) ..................................................................13

15

16

*Shanks v. Jarrow Formulas, Inc.*,
    2019 WL 7905745 (C.D. Cal. Dec. 27, 2019) .........................................................23, 24

17

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)................................................................................................14, 22

18

19

*Surrell v. California Water Serv. Co.*,
    518 F.3d 1097 (9th Cir. 2008).......................................................................................13

20

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)......................................................................................................22

21

22

*Weiss v. Trader Joe's Co.*,
    838 F. App'x 302 (9th Cir. 2021) ..................................................................................18

23

*Whitaker v. Thompson*,
    353 F.3d 947 (D.C. Cir. 2004) .................................................................................21, 22

24

25

*Whiteside v. Kimberly Clark Corp.*,
    108 F.4th 771 (9th Cir. 2024).........................................................................................18

26

*Wilson v. Frito-Lay N. Am., Inc.*,
    260 F. Supp. 3d 1202 (N.D. Cal. 2017) .........................................................................19

27

*Winsor v. Sequoia Benefits & Ins. Servs. LLC*,
    2021 WL 5053087 (N.D. Cal. Nov. 1, 2021).................................................................22

28

1

**TABLE OF AUTHORITIES**

2

Page(s)

3

**Other Authorities**

4

FDA, *Guidance for Industry:  A Food Labeling Guide* (Jan. 2013),
    https://www.fda.gov/files/food/published/Food-Labeling-Guide-%28PDF%29.pdf ....................21

5

https://www.boost.com/products/boost-glucose-control.........................................................................4

6

https://www.cdc.gov/diabetes/about .................................................................................................3

7

https://www.cdc.gov/diabetes/treatment .........................................................................................3

8

**Rules**

9

Fed. R. Civ. P. 56 ..................................................................................................................13

10

**Regulations**

11

21 C.F.R. § 101.14 ................................................................................................................21

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO THE NAMED PLAINTIFFS
Case No. 3:21-cv-09812-JSC

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

This case is about what Plaintiffs expected when they bought Boost Glucose Control, and whether these nutritional drinks lived up to their labeling and advertising. Discovery has shown that the drinks satisfied all reasonable expectations Plaintiffs could have had, such that summary judgment is warranted on all of Plaintiffs' false-advertising claims.

Boost Glucose Control is a drink that delivers enough nutrition to serve as either a meal replacement or a hearty, nutrient-filled snack between meals. The undisputed evidence, which includes unrebutted clinical trial data, shows that Boost Glucose Control causes a lower and more gradual rise in blood sugar when compared to a standard nutritional drink that is not designed with diabetics in mind. This is the result of several factors in the overall product design, including a patented formula that balances fat, protein, and carbohydrates; use of a low-glycemic sweetener called tapioca dextrin; high levels of chromium (a mineral that has been associated with improved blood-sugar response); and a significantly lower amount of sugar than is found in standard nutritional drinks.

In their depositions, Plaintiffs Sandra George, Bruce Horti, and Steven Owen each agreed that Boost Glucose Control provides these benefits, and all agreed that Boost Glucose Control is a better choice for people with diabetes than a standard nutritional drink. Yet Plaintiffs' counsel claim these benefits are not enough. Their argument is that the only way for Boost Glucose Control to not be "deceptively" labeled is for the drinks to provide a miracle solution for blood-sugar management: that "whatever one's blood glucose is at the time they drink [Boost], drinking [Boost] will make it better." Dkt. 59 ("Compl.") ¶ 50. That theory was enough to get past the pleadings, but it fails on summary judgment because none of the named Plaintiffs actually had this expectation of Boost Glucose Control.

All three Plaintiffs admitted to knowing that *any* drink containing sugar will necessarily cause their blood sugar to rise. All three Plaintiffs agreed that the Boost Glucose Control front label disclosed in large font that the drinks contain sugar. And all three Plaintiffs conceded that they do not know of any product that always makes blood sugar "better." Plaintiff George testified that she knew exactly what Boost Glucose Control did to her blood sugar, and happily bought and drank *hundreds* of bottles for years after she filed the complaint in which she claimed she was "deceived." Plaintiff Horti testified

Gibson, Dunn &
Crutcher LLP

that all he wanted when he bought Boost was a nutritional drink that would cause "*less* of a spike" in his blood sugar, which is exactly what the drinks are clinically proven to do.  Plaintiff Owen likewise testified that he didn't think any food or drink could always make your blood sugar "better," and conceded that, if he had paid any attention to the prominent front-label disclosure that the drinks contain four grams of sugar, he would have known that the drinks would affect his blood glucose by causing a gradual increase due to the low amount of sugar.

In short, what Plaintiffs got when they bought Boost Glucose Control was exactly what they would expect given their background knowledge about blood sugar and the on-bottle statements about nutritional composition.  They each received a high-quality nutritional drink that causes a lower and more gradual rise in blood sugar, and which featured ingredients and macronutrient balances helpful for people with diabetes.

Plaintiffs' hoped-for evidence of deception has not materialized.  Should they attempt to evade the force of this undisputed evidence by pointing to supposed regulatory violations on the Boost labeling, they will not be able to sustain the claims on that theory either.  Their mislabeling arguments both misread the relevant federal laws and ignore the requirement Plaintiffs must prove an actual injury—rather than a mere regulatory violation—to maintain their claims.

The Court should resolve this motion before addressing Plaintiffs' forthcoming motion for class certification because it presents issues that will moot that motion.  *See Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003) ("If the individual plaintiff lacks standing, the court need never reach the class action issue."); *Corbin v. Time Warner Ent.-Advance/Newhouse P'ship*, 821 F.3d 1069, 1085 (9th Cir. 2016) (if a "claim is without merit as applied to [the named plaintiff], it follows that the district court need not inquire as to whether that meritless claim should form the basis of a class action").  Because Nestlé is entitled to judgment on Plaintiffs' individual claims, the Court should grant this motion and resolve Plaintiffs' claims in their entirety.[1]

---

[1] Should the Court later certify a class in this case, Nestlé reserves the right to seek classwide summary judgment, raising issues pertaining to the class that are not implicated by this narrower motion focused on named Plaintiffs' testimony and individual circumstances.  *See Hoffman v. Tonnemacher*, 593 F.3d 908, 911 (9th Cir. 2010) ("[A] successive motion for summary judgment is particularly appropriate on an expanded factual record.").

## II. BACKGROUND

**A.     Boost Glucose Control is clinically proven to cause a lesser and more gradual rise in blood sugar, which is helpful for people with diabetes.**

It is scientific fact that eating or drinking anything that has calories will cause blood sugar to rise. *See generally* https://www.cdc.gov/diabetes/about.  Ordinarily, this rise in blood sugar triggers a release of insulin from the pancreas, causing blood-sugar levels to fall again. *Id.*  Diabetes interferes with insulin production, which means too much blood sugar stays in the bloodstream, in turn leading to a variety of health issues. *Id.*

There is no cure for diabetes, nor any silver-bullet medication that always keeps blood sugar at a healthy level.  Instead, as Plaintiffs concede, people with diabetes have to actively manage their blood sugar through a combination of exercise, healthy eating, and using insulin or other medication. *See* Compl. ¶ 19; *see also* https://www.cdc.gov/diabetes/treatment.  Diabetes management typically involves avoiding "spikes" in blood-sugar levels by reducing sugar intake and choosing foods that cause blood sugar to rise and fall more gradually, allowing the body to stay within a healthy range of blood-sugar levels. *See id.*  Multiple factors can affect how a given food or drink impacts blood sugar, including the food's glycemic index, the number of calories, and the nutritional composition. *See id.*

This case revolves around two nutritional drinks, Boost Glucose Control and Boost Glucose Control High Protein, both of which are designed to avoid spikes in blood sugar while providing balanced nutrition that can serve as a meal replacement.  Multiple unrebutted clinical studies have shown that the products do just that:  drinking Boost Glucose Control causes a more gradual rise and fall in blood sugar when compared to standard nutritional drinks that are not designed with diabetics in mind. *See* Declaration of T. Loose ("Loose"), Exs. 10–15.  This feature distinguishes Boost Glucose Control from other Boost nutritional drinks, such as Boost Original, Boost Very High Calorie (for those struggling to maintain weight), Boost Women, and Boost Pre-Meal Hunger Support.

Boost Glucose Control's reduced impact on blood-sugar levels is the result of the product's unique formulation, which contains a balanced blend of protein, fat, fiber, and carbohydrates, as well as tapioca dextrin, a low-glycemic sweetener that is not used in standard products.  Boost Glucose Control also contains a patented blend of vitamins and minerals designed to help avoid spikes in blood

sugar, including chromium, which is important for metabolizing glucose. *See* Loose, Ex. 1 at 60:4–22; 112:20–113:22.[2]

The graph below shows the difference in effect on blood-sugar levels between Boost Glucose Control and a standard nutritional drink. Most notably, Boost Glucose Control causes a significantly lower peak, and returns to baseline more quickly:



*See* Loose, Ex. 14.

Plaintiffs do not and cannot dispute the results of these tests; they concede that studies show Boost Glucose Control is "associated with a lesser rise in glucose levels as compared to" a standard nutritional drink. Compl. ¶ 5; *see also id.* ¶¶ 56–60. Consistent with these results, Boost Glucose Control's proven effectiveness has led it to be one of the top nutritional drinks recommended by endocrinologists. *See* https://www.boost.com/products/boost-glucose-control.

---

[2] Though the formulation changed slightly over time, it did not materially vary in how it affected blood sugar. *See* Dkt. 79 (stipulation of the parties).

**B.     The labeling and advertising of Boost Glucose Control accurately communicate the product's benefits.**

Although the labels for Boost Glucose Control and Boost Glucose Control High Protein changed slightly over time, *see* Dkt. 79 at 1–3, all versions of the labels used during the relevant period explained that the product is a "balanced nutritional drink," which "helps manage blood sugar♦." The superscript diamond (♦) refers the consumer to language on the back label, describing that the drink is "Clinically shown to produce a lower blood sugar response vs. a standard nutritional drink in people with type 2 diabetes. Incorporate into a balanced diet as part of a medically supervised diabetes management plan." Later labels also featured in the same section the bolded statement: "**Not a substitute for medication**." Examples of these label statements are shown below:



Loose, Ex. 2 (12-pack label available for sale between December 2021 and May 2024).

The front labels of all bottles and boxes of Boost Glucose Control prominently display the amount of protein and sugar in each bottle. Some earlier versions of the labels—which were

5

1    discontinued in the first part of 2021, *see* Dkt. 79—also featured the phrase "designed for people with

2    diabetes" and "nutrition for people with diabetes."  Those phrases do not appear on bottles after that

3    point in time.  An example of one such earlier front label is shown below:



Loose, Ex. 3 (six-pack label available for sale between December 2019 and August 2020).

The  back  label  of  all  Boost  Glucose  Control  packaging  also  featured  a  standard,  detailed

"Nutrition Facts" panel.  For instance, the panel on the 12-pack of Boost Glucose Control shown above

disclosed that each 8-oz bottle contains, among other things, 190 calories, 16 carbohydrates, 4 grams

of sugar, 16 grams of protein, and 100% of the daily value of chromium.  Loose, Ex. 2.  In later versions

of the drink, the amount of chromium was increased to 130% of the daily value.  *Id.*, Ex. 3.

Nestlé also ran a limited number of ads for Boost Glucose Control during the relevant period,

including a TV commercial that ran in various nationwide markets from 2019 to 2023.  Loose, Ex. 4 at

198:10–21; 248:7–12.  Still frames from that TV ad—which included a chart showing that Boost

Glucose Control would cause a lesser and more gradual rise in blood sugar compared to a standard

nutritional drink—are shown below:

Gibson, Dunn &
Crutcher LLP





Loose, Ex. 5. None of the statements on the product or in the advertising ever promised to make blood sugar levels lower or "better" after drinking.

### C.  Plaintiffs' complaint claims they thought Boost Glucose Control would always make their blood sugar "better," no matter what.

Plaintiffs Bruce Horti, Sandra George, and Steven Owen have filed multiple iterations of their complaint, but the basic theory has remained the same: Plaintiffs say the Boost labels are deceptive because consumers allegedly view those labels as promising to "mitigate, treat, or prevent" diabetes. Compl. ¶¶ 77–79.[3] Plaintiffs do not deny that the product provides a lesser and more gradual rise in

---

[3] The original complaint in this case also brought claims on behalf of another plaintiff, Jeanette Craig, who appears to have voluntarily dropped her claims by the time Plaintiffs filed the now-operative

Gibson, Dunn &
Crutcher LLP

blood sugar.  Instead, the theory they alleged in the complaint was that these benefits are not enough, and the product is deceptively labeled unless Nestlé can guarantee that "whatever one's blood glucose is at the time they [drink Boost], drinking [Boost] will make it better."  *Id.* ¶ 50.  Plaintiffs also say that the labels "violate federal regulations."  *Id.*

Judge Hamilton twice determined that Plaintiffs' theory of deception is implausible, and twice dismissed Plaintiffs' claims at the pleading stage.

In the first order, Judge Hamilton explained that the Boost labels "would not lead a reasonable consumer to believe that the Boost nutritional drinks would treat" diabetes.  Dkt. 27 at 12.  That is because the "product labels simply do not . . . represent that Boost Glucose Control will on its own treat diabetes or maintain healthy glucose levels." *Id.* at 13.  To the contrary, the Boost labels accurately disclose the ingredients, including the sugar content, in each drink, and "do[] not involve any misrepresentation." *Id.*  Moreover, "[r]easonable consumers, particularly reasonable consumers who monitor their blood sugar, understand that consuming food, including nutritional drinks like Boost, impacts blood sugar levels," so no reasonable consumer "would mistake the [on-label] representations for promises of treatment or even replacements for the insulin so many are prescribed." *Id.*

After Plaintiffs filed an amended complaint, Judge Hamilton held that Plaintiffs' minor adjustments could not save their inherently implausible theory, and dismissed with prejudice.  Dkt. 39.  Judge Hamilton explained that reasonable consumers would not "believe that the over-the-counter [Boost] drink would treat or cure diabetes, a chronic disease for which there is no known cure." *Id.* at 9.  That is because the "clear designations of the nutritional contents on the front of the label, along with the description as nutritional drinks, demonstrate that the products are a food that will necessarily impact glucose levels, not a health supplement or a drug that would treat" diabetes. *Id.*

Plaintiffs appealed, arguing that the dismissal order was erroneous because they and other consumers allegedly believed the Boost drinks "can help control blood glucose levels, *i.e.*, help keeping them within an acceptable range." *Horti v. Nestlé Healthcare Nutrition, Inc.*, No. 22-16832, Dkt. 15.

Consolidated Complaint.  Steven Owen's claims were initially brought in a separate case in New Jersey, and were consolidated with the first-filed action in California.  *See* Case No. 3:22-cv-02855, Dkts. 1, 36.  Given that all claims are now consolidated, Dkt. 59, this brief refers to Ms. George, Mr. Horti, and Mr. Owen's claims jointly throughout.

Gibson, Dunn & Crutcher LLP

8

The Ninth Circuit reversed the dismissal order in a short, unpublished, non-precedential, memorandum disposition. *Horti v. Nestlé Healthcare Nutrition, Inc.*, 2023 WL 8613601 (9th Cir. Dec. 13, 2023). The court held that, in light of Plaintiffs' alleged beliefs about the Boost labels, whether a "consumer could expect the product to exert some benefit on the control and regulation of blood sugar" was "not appropriate for resolution on a motion to dismiss." *Id.* at *1. The court further held that it could not "draw conclusions as to whether the consumers who purchased BOOST Glucose Control were more knowledgeable about its potential health benefits" when compared to consumers who do not monitor their blood sugar, again reasoning that to be a fact issue to be determined after discovery. *Id.* at *2.

### D.    Discovery undermines all of Plaintiffs' claims.

Following remand, the parties engaged in exactly the kind of discovery the Ninth Circuit thought necessary to resolve these claims, including depositions of the three named Plaintiffs. This process has confirmed that the district court's initial dismissal order was right. None of the Plaintiffs interpret the Boost Glucose Control labels as promising a miracle treatment for diabetes. Each understands exactly what the products do: provide balanced nutrition that does not cause blood sugar to spike, but instead causes a gradual rise and fall in blood sugar that allows people to keep their glucose levels in a healthy range. The drinks also contain low-glycemic sweeteners (like tapioca dextrin) and added minerals (like chromium) to assist with delivering this benefit. As discussed in detail below, each Plaintiff testified that these features are beneficial for diabetics, and make Boost Glucose Control a better choice for diabetics than competing nutritional drinks that do not use these ingredients and that are not formulated with diabetics in mind.

**Sandra George** was diagnosed with diabetes fourteen years ago and started buying and drinking Boost Glucose Control High Protein over five years ago. Loose, Ex. 6 at 26:4–10, 134:9–14. When Ms. George saw the labels, she thought the drinks would cause her blood sugar to rise by a moderate amount, such that it was neither "under" healthy levels nor "spiking," but instead within "normal ranges." *Id.* at 35:25–36:17, 36:25–37:12, 125:4–12, 161:18–22. Ms. George drank Boost approximately twice a day, every day, for multiple years up until early 2024. This continued even after she joined the lawsuit in 2021 and only stopped a few months before her deposition was initially noticed in 2024. *Id.* at 45:3–7; 46:19–47:6; 59:6–60:15; 143:4–25. In other words, Ms. George continued to

buy and enjoy Boost for *more than two years* after her lawyers filed a complaint claiming she had been deceived and "would not have purchased the Products had [she] not relied on" the alleged "false advertising." Dkt. 1 ¶ 165 (Dec. 20, 2021). Despite these purchases in the past, Ms. George testified that she would "probably not" buy Boost again in the future because she has since found a different brand she likes more. Loose, Ex. 6 at 167:8, 167:23.

Out of the hundreds of bottles of Boost Glucose Control High Protein that Ms. George drank, there were only "two, three times" that she says her blood sugar rose to the "upper end" of her personalized target range. Loose, Ex. 6 at 37:21–38:23; 55:3–10, 60:18–23. The levels did not exceed her target range, though, and her outlier experiences did not stop her from coming back to the product for years afterward. Out of the hundreds of times she drank Boost Glucose Control, Ms. George did not recall *ever* having her blood sugar rise above her target range after consuming the product. *Id.* at 38:19–23 ("Q: Did you ever drink a Boost Glucose Control and cause your blood sugar to go outside the upper end? A: Not that I am aware of.").

Ms. George testified that she had not read anything at all in this case (not even her interrogatory responses), so it was no surprise that she did not endorse the theory of deception articulated in the complaint. Loose, Ex. 6 at 110:24–111:14, 190:6–20. She did not think Boost Glucose Control would act like a medication; she agreed that no food can make blood sugar levels go down or stay steady no matter what; and she did not think that the Boost labels were promising to treat her diabetes. *Id.* at 101:16–18, 106:8–107:24, 108:13–109:10, 125:21–126:19. She knew Boost had sugar and she expected that it would raise her blood sugar levels to a certain extent, but still bought the drinks because the sugar levels were low and would cause a muted rise in blood sugar, the drinks had a lot of protein, and she liked the taste. *Id.* at 47:7–19, 127:12–24. She agreed that products like Boost, which she knows contain less sugar and expects will cause a more gradual rise in blood sugar, are helpful for people with diabetes. *Id.* at 113:23–114:8, 126:8–11, 141–15–18, 172:17–173:14, 176:7–13. She therefore kept drinking two bottles a day, doing so for years after responding to a lawyer's invitation to join this case. She stopped buying Boost Glucose Control only when she entered retirement and was looking for ways to cut her living expenses by switching to generic brands. *See id.* at 163:18–23.

Gibson, Dunn &
Crutcher LLP

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO THE NAMED PLAINTIFFS
Case No. 3:21-cv-09812-JSC

**Bruce Horti** couldn't recall much about his alleged purchases of Boost Glucose Control. He couldn't recall when he started buying the drinks, when he stopped, or why he stopped. Loose, Ex. 7 at 59:10–60:5, 74:1–13. He couldn't recall if he looked at the amount of sugar in the drink—or any of the ingredients at all—before buying. *Id.* at 28:5–28:21, 52:7–13, 53:7–10, 54:3–13. He couldn't even say for sure if he has *ever* looked at the label of Boost Glucose Control. *Id.* at 116:24–117:3.

Notwithstanding his hazy memory, Mr. Horti testified that he "hoped" Boost Glucose Control would have "benefits" for his diabetes when he bought it. *E.g.*, Loose, Ex. 7 at 27:24–28:21, 156:17–158:11. When asked to explain further, Mr. Horti admitted that the only "benefit" he expected was "less of a spike" in his blood sugar. *Id.* at 132:1–14, 132:23–133:5. He agreed such a lesser spike would be better for people with diabetes, and said he would be willing to pay more a drink that would provide a lesser spike. *E.g.*, *id.* at 31:19–25, 62:20–24, 115:5–116:2. He could point to no "facts" to suggest that Boost Glucose Control does not deliver such a benefit, and said at most he had an unproven "suspicion" that it may not. *Id.* at 203:13–204:4. Likewise, he speculated that he may have believed when he bought Boost Glucose Control that he did so hoping that it had a "special ingredient," which he thought might have been chromium, because chromium "is supposed to have a benefit for diabetics." *Id.* at 28:13–17, 157:14–17; 160:12–162:24. Although Mr. Horti did not recall ever looking at the label, had he done so, he would have seen from the nutrition facts panel that Boost Glucose Control contains 44 micrograms of chromium—130% of the recommended daily value, and more than double the amount found in Boost Original. Loose, Ex. 2.

Mr. Horti has no immediate plans to buy Boost again, but indicated he "might" buy the drinks in the future, if the company "improved" the formulation—but again, could not say what kinds of improvements he was looking for. Loose, Ex. 7 at 171:16–172:11. Finally, Mr. Horti also testified that he never thought the Boost drinks claimed to prevent diabetes, nor that they promised to keep blood-sugar levels in a healthy range, and was aware of no product that could do that. *Id.* at 155:16–20, 216:3–7, 218:9–18.

**Steven Owen** bought one 24-pack of Boost Glucose Control on Amazon in April 2022, about a month before filing a copycat complaint in federal court that lifted whole paragraphs from the *Horti* case that had been filed in December 2021. Loose, Ex. 8 at 64:14–17; Case No. 3:22-cv-02855, Dkt. 1

(May 25, 2022).  Mr. Owen never bought Boost again after this single purchase and testified that he doesn't plan to buy Boost any time in the future because he doesn't like the taste, and generally doesn't like nutritional drinks of any type.  Loose, Ex. 8 at 78:5–10, 82:19–20, 98:15–99:13.

Mr. Owen testified that, when making his single purchase, he never looked at the amount of sugar listed on the front label, the nutrition facts, or any other information on the label; the *only* thing he said he looked at before buying was the name of the product, without any context.  Loose, Ex. 8 at 67:13–22 ("Q:  Did you look at anything else on the label other than just the name?  A:  Just the name.");  *see also id.* at 94:15–21, 97:15–20, 110:7–25.  He also testified that he "might have" seen a TV ad for Boost Glucose Control before buying, but could not recall any of the details of that ad.  *Id.* at 64:18–65:2, 68:7–16.  Otherwise, Mr. Owen never looked at any other information about Boost Glucose Control, whether on the label, on the Amazon webpage where he bought the drinks, or anywhere else.  *Id.* at 95:7–15, 97:15–20.  Nor did he compare Boost Glucose Control to any other nutritional drinks when deciding whether to buy.  *Id.* at 80:18–23, 84:11–25.

Looking past all information on the label and Amazon page, Mr. Owen concluded from looking at the brand name alone that the Boost drinks would keep his blood sugar "steady," meaning the drinks would have no effect at all on blood sugar.  Loose, Ex. 8 at 66:20–67:5, 114:25–115:7.  Mr. Owen came to this conclusion because he believed the drinks were sugar-free.  *See id.* at 94:15–95:6.  But once he realized during his deposition that the drinks clearly disclose that they contain four grams of sugar on the front of the package, Mr. Owen testified he was "not sure" anymore if he reasonably thought the drinks would have kept his blood sugar steady.  *Id.*  This was because he knows from managing his own diabetes—which he has managed since his diagnosis of diabetes in 1989—that even a small amount of sugar would necessarily cause blood sugar to rise.  *See id.*; *see also id.* at 48:22–24.  He further testified that he doesn't know of *any* food or drink that can have sugar and yet not cause his blood sugar to rise.  *Id.* at 101:5–8, 115:21–23, 119:16–19, 120:2–4.  When he was shown charts indicating the different effect Boost Glucose Control has on blood-sugar levels when compared to a standard nutritional drink, Mr. Owen agreed Boost Glucose Control would be better for diabetics, as it would avoid blood-sugar spikes.  *Id.* at 125:6–128:24, 132:4–133:3.

Like the other Plaintiffs, Mr. Owen could not endorse the theory behind the complaint. Whereas the complaint alleged that Mr. Owen thought Boost would "treat, or prevent prediabetes or diabetes" by making blood sugar "better" no matter what it is at the time consumers drink it, Comp. ¶¶ 4, 50, Mr. Owen himself testified that he didn't think Boost would prevent or treat diabetes, because he knows no food or drug could "control" blood sugar levels by always making them "better," Loose, Ex. 8 at 55:20–56:1, 62:8–17, at 65:20–22, 144:23–145:11. That Mr. Owen's own understanding didn't track the allegations in the complaint is unsurprising given that he had never read the complaint making allegations on his behalf before it was filed. *Id.* at 141:18–23.

\*     \*     \*

In sum, each of the three named Plaintiffs testified that they never believed Boost Glucose Control will always make blood sugar "better." Each recognized that drinks like Boost Glucose Control with some sugar will necessarily cause blood-sugar levels to rise. Each also stated their goal was to avoid sharp spikes in blood sugar, and conceded that products that do not cause a blood sugar spike are better for their diabetes. Avoiding that kind of blood-sugar spike is exactly what Boost Glucose Control is clinically proven to do, and Plaintiffs do not deny that the product does deliver that benefit.

### III.  LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if there is enough evidence for a reasonable fact finder to find for the non-moving party, and "material" only if the fact may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–249 (1986). If the movant makes an initial showing of "an absence of evidence to support the non-moving party's case," the burden shifts to the non-movant, who must "go beyond the pleadings" and point to "specific facts showing that there is a genuine issue for trial." *Pac. Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 897 (9th Cir. 2021). "Conclusory statements without factual support are insufficient to defeat a motion for summary judgment." *Surrell v. California Water Serv. Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008).

Gibson, Dunn &
Crutcher LLP

13

# IV.  ARGUMENT

Plaintiffs' consolidated complaint raises seven causes of action, all of which share two key elements:  deception and a resulting financial harm.  *See Romoff v. Gen. Motors LLC*, 2023 WL 1097258, at *1 (9th Cir. Jan. 30, 2023) ("Deceptive conduct is required to state a claim for relief under the relevant provisions of both California and New Jersey law."); *Baghdasarian v. Amazon.com Inc.*, 458 F. App'x 622, 623 (9th Cir. 2011) (plaintiffs in a false-advertising case must "establish that the alleged misrepresentation was an 'immediate cause' or 'substantial factor' in the plaintiff's decision to engage in the injury-producing conduct").  Article III likewise "requires a concrete injury" that is "fairly traceable to the challenged conduct of the defendant" to maintain claims in federal court. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, 341 (2016).

Plaintiffs cannot establish either deception or a resulting injury based on the Boost labeling because their own sworn testimony makes clear that, contrary to the allegations in their complaint, they were neither deceived nor harmed by those labels.  *See infra* § IV.A.  Plaintiffs cannot paper over this fundamental flaw by relying on FDA regulations, both because the Boost labels are not "misbranded" and because a mere regulatory violation is not enough to sustain their claims without corresponding harm to Plaintiffs.  *See infra* § IV.B.  Finally, at a minimum, Plaintiffs lack standing to seek injunctive relief to change the Boost labels.  *See infra* § IV.C.

## A.    Plaintiffs' deposition testimony shows they suffered no injury.

### 1.    Plaintiff Sandra George.

Ms. George's testimony shows she is a satisfied customer who got exactly what she wanted from Boost:  a nutritional drink with low levels of sugar and high levels of protein that would neither causer her blood sugar to be "under" healthy levels nor "spiking," but instead help her keep it within "normal ranges."  Loose, Ex. 6 at 35:25–36:17, 36:25–37:12, 125:4–12, 161:18–22.  Contrary to what is alleged in the complaint, Ms. George never thought Boost would keep her blood sugar at "healthy" or "better" levels, no matter what.  *Id.* at 108:13–109:12.  Instead, "all [she] thought" was that drinking Boost "wasn't going to make [her blood sugar] spike." *Id.* at 109:3–4.  And she agreed that a nutritional drink that causes a lesser rise in blood sugar and helps avoid spikes—which Boost Glucose Control is

Gibson, Dunn &
Crutcher LLP

clinically proven to do—is a better option for them, and also for others with diabetes. *Id.* at 113:23–114:8, 126:8–11, 141–15–18, 172:17–173:14, 176:7–13.

Courts have granted summary judgment in similar circumstances where a product "comport[s] with the Plaintiff's own understanding of the message" on the label. *Major v. Ocean Spray Cranberries, Inc.*, 2015 WL 859491, at *5 (N.D. Cal. Feb. 26, 2015), *aff'd*, 690 F. App'x 564 (9th Cir. 2017). In *Major*, the complaint claimed that a juice label was deceptive because the phrase "no sugar added" allegedly led consumers to believe the products are "low in calories." *Id.* at *3. But when the plaintiff was asked in her deposition whether she bought the juice "because she thought it was a reduced calorie product, she answered 'no.'" *Id.* The court granted summary judgment, which was affirmed on appeal. *Id.* Similarly, in *Golden v. Home Depot U.S.A., Inc.*, the court granted summary judgment on false-advertising claims about whether wood counted as "authentic mahogany" because the plaintiff's testimony revealed he understood that he was buying a wood variety known as "swamp mahogany," which "contradicts the allegations of his complaint that [the defendant] misled him" into thinking he was receiving a more expensive variant of mahogany wood. 2020 WL 2571431, at *4 (E.D. Cal. May 21, 2020).

What was true in *Major* and *Golden* is true here: Ms. George's testimony does not follow the theory of deception alleged in her complaint. She knew that the drinks would raise her blood sugar, and she chose them because she wanted a lesser increase than she would receive than from consuming a standard nutritional drink. She did not expect the drinks to make her blood sugar "better," no matter what. *Compare* Loose, Ex. 6 at 108:13–109:10 (agreeing that she "never thought" Boost would "keep you in a preferred range no matter what" and testifying "I thought it wasn't going to make [my blood sugar] spike. That's all I thought") *with* Compl. ¶ 5 (alleging that Ms. George and other Plaintiffs understood the Boost labels to promise that "whatever one's blood glucose is at the time they take the Products, drinking the Products will make it better"). Because Boost delivered on her expectations, Ms. George proceeded to happily buy and consume *hundreds* of bottles of the drink, even after a complaint was filed in her name making accusations of deception that she neither read nor endorsed. Loose, Ex. 6 at 45:3–7; 46:19–47:6; 59:6–60:15; 143:4–25.

Other courts have come to the common-sense conclusion that a consumer like Ms. George who continued to buy a product after learning of supposed "false adverting" cannot claim to have been harmed by that product. For instance, in *Red v. Kraft Foods, Inc.*, the court explained that plaintiffs who "continued to purchase [the challenged products] after . . . this lawsuit was filed, and [after] they had knowledge that the representations on the packages were false or misleading" could not "establish reliance and/or materiality of the alleged misrepresentations." 2011 WL 4599833, at *12 (C.D. Cal. Sept. 29, 2011). Similarly, in *Faulk v. Sears Roebuck & Co.*, the fact that the plaintiff "continued to purchase" the challenged product "even after he became aware of" the allegations underlying his complaint "cast doubt on whether [the plaintiff] himself found the alleged omissions material." 2013 WL 1703378, at *9 (N.D. Cal. Apr. 19, 2013); *see also Doe v. SuccessfulMatch.com*, 70 F. Supp. 3d 1066, 1082 (N.D. Cal. 2014) ("If Plaintiffs purchased or continued to purchase Defendant's services after discovering Defendant's allegedly fraudulent conduct, then Plaintiffs may have no claim under either the UCL or the CLRA."). So too here; that Ms. George bought Boost Glucose Control *after* she knew how the products would affect her blood sugar and *after* her lawyers claimed she was "deceived" shows she suffered no injury from relying on supposedly deceptive label statements.

## 2.    Plaintiff Bruce Horti.

As a threshold matter, Mr. Horti has no basis to support his claims because he is not sure he ever even looked at the label that this alleged false-advertising case is built on:

> Q: Can you recall at any time ever looking at the label on Boost Glucose Control?
>
> A: Again, I'd be sort of speculating. I don't know, particularly on Boost Glucose Control, if I looked at the label. I'm not sure.
>
> Q: Is it your typical practice to look at a label on a food before you buy it or not?
>
> A: Not always.

Loose, Ex. 7 at 116:24–117:6.

Without being able to establish that he even *looked at* the labels, Mr. Horti cannot prove at the summary-judgment stage that he was *deceived* by the labels. *See Moorer v. StemGenex Med. Grp., Inc.*, 830 F. App'x 218, 220 (9th Cir. 2020) (consumers "who never saw the alleged misrepresentation . . . were, by definition, not injured and cannot recover"); *accord, e.g., Doe*, 70 F. Supp. 3d at 1082

Gibson, Dunn & Crutcher LLP

("[I]f Plaintiffs did not see the specified representations before they purchased Defendant's services, then Plaintiffs did not rely on these representations and suffered no injury."); *In re iPhone Application Litig.*, 6 F. Supp. 3d 1004, 1015 (N.D. Cal. 2013) ("For the Plaintiffs' harm to be 'fairly traceable' to [the challenged] misrepresentations, Plaintiffs must have seen the misrepresentations and taken some action based on what they saw—that is, Plaintiffs must have actually relied on the misrepresentations to have been harmed by them."). In *Khasin v. Hershey Co.*, the court granted summary judgment under nearly identical circumstances where the "Plaintiff testified that he could not recall looking at [the challenged] labels." 2014 WL 1779805, at *4 (N.D. Cal. May 5, 2014). Mr. Horti's inability to say whether he saw the Boost labels likewise warrants summary judgment here.

Even beyond this threshold issue, Mr. Horti's testimony underscores that he was not deceived, as he understood exactly what the Boost drinks would do to his blood sugar before he drank them. Mr. Horti never thought the Boost drinks claimed to prevent his diabetes, nor that they promised to keep his blood sugar levels in a healthy range. Loose, Ex. 7 at 155:16–20, 216:3–7, 218:9–18. All Mr. Horti thought when he was buying Boost was that the drinks would cause "less of a spike" in his blood sugar, and he hoped the drinks potentially might have an ingredient known to help with blood-sugar management, like chromium. *Id.* at 28:13–17, 132:1–14, 132:23–133:5, 157:14–17. Boost Glucose Control delivered on both of those hopes. As Plaintiffs concede, multiple clinical studies show Boost is "associated with a lesser rise in glucose levels." Compl. ¶ 5; *see also supra* at pp. 3–4. And the drinks indisputably contain 44 micrograms of chromium—130% of the recommended daily value, and more than double the amount found in Boost Original. *Supra* at p. 6. Because the drinks delivered exactly what Mr. Horti expected, he has suffered no deception or injury. *See Major v. Ocean Spray Cranberries, Inc.*, 690 F. App'x 564, 565 (9th Cir. 2017) (affirming summary judgment where "Plaintiff's own testimony established that she understood" the challenged label statements).

Finally, even if one assumes that Mr. Horti could discard this testimony and hypothetically prove that he both saw and formed an inaccurate impression of the Boost labels, he *still* would not have a claim because he admitted that he ignored all relevant context on the labels. Despite testifying that sugar is an important consideration in determining how foods affect his blood sugar, Loose, Ex. 7 at 209:5–20; 234:9–13, Mr. Horti could not recall ever looking at the amount of sugar in the drinks—

17

Gibson, Dunn & Crutcher LLP

which was listed in bold font on the front label—nor any of the other ingredients, *id.* at 28:5–28:21, 52:7–13, 53:7–10, 54:3–13. A plaintiff cannot manufacture a false-advertising claim by ignoring "all the information available to consumers and the context in which that information is provided and used." *Moore v. Trader Joe's Co.*, 4 F.4th 874, 882 (9th Cir. 2021).

Mr. Horti ignored key context, including the clearly disclosed amount of sugar on the front of the label and the diamond-shaped asterisk next to the phrase "helps manage blood sugar," which corresponded to a back-label statement that the drinks are "clinically shown to produce a lower blood sugar response vs. a standard nutritional drink in people with type 2 diabetes. Not a substitute for medication." *Supra* at pp. 5–6; *Whiteside v. Kimberly Clark Corp.*, 108 F.4th 771, 785 (9th Cir. 2024) (holding that "the presence of an asterisk alone puts a consumer on notice that there are qualifications or caveats"). Because Mr. Horti ignored contextual clues that he himself testified would be relevant to assessing how Boost affects blood sugar, he cannot state a claim for deception.

### 3. Plaintiff Steven Owen.

Mr. Owen testified that, when buying Boost Glucose Control, he looked at "Just the name" of the product and no other statements on the label. Loose, Ex. 8 at 67:13–22. That means he ignored all of the following statements, which a reasonable consumer would have been expected to consider:

- The phrase "helps manage blood sugar ♦" on the front label, along with the corresponding back-label statement that "♦ BOOST GLUCOSE CONTROL Balanced Nutritional Drink is clinically shown to produce a lower blood sugar response vs. a standard nutritional drink in people with type 2 diabetes. Not a substitute for medication";

- The front-label, bold-font statements indicating that each drink contains four grams of sugar;

- The back-label nutrition facts panel, which reiterated the front-of-package statement and showed exactly how much sugar and how many calories are in each drink; and

- The product information on the Amazon page where he bought the drinks, which reiterated that the products contain sugar and are "not a substitute for medication." Loose, Ex. 9.

The Ninth Circuit has made clear that a plaintiff cannot manufacture a false-advertising claim by viewing three words (Boost Glucose Control) in isolation and blinding himself to all context.

*Moore*, 4 F.4th at 882; *Weiss v. Trader Joe's Co.*, 838 F. App'x 302, 303 (9th Cir. 2021) ("[P]roduct packaging should be examined in its full context because it would be unreasonable to cherry-pick discrete statements to prove deception.").

Mr. Owen's testimony underscores why that is the rule; once he was shown that the front label of the drinks have clearly disclosed amounts of sugar in large, bolded font, Mr. Owen said he was "not sure" if he would have thought the drinks would have kept his blood sugar steady, and further testified that he doesn't know of *any* food or drink that has sugar and yet won't cause his blood sugar to rise. Loose, Ex. 8 at 95:4–6, 101:5–8, 115:21–23, 119:16–19, 120:2–4. Mr. Owen had a diabetes diagnosis for more than 30 years before he bought Boost Glucose Control, and knew that any drink with any amount of sugar would raise his blood-sugar levels. *Id.* at 48:22–24; 100:25–101:8. He cannot maintain a claim of deception by ignoring prominent, front-label information that even he has admitted would be relevant to interpreting what Boost does to blood sugar.[4]

If the Court credits Mr. Owen's testimony that he saw a TV ad for Boost Glucose Control prior to buying the drinks, that makes his position even *weaker*. The TV ad in question featured a chart showing that Boost Glucose Control would cause blood sugar levels to rise; the distinctive feature was that Boost Glucose Control caused blood sugar to rise more gradually and to a lesser degree than a standard nutritional drink. Loose, ¶ 5, Ex. 5; *supra* at p. 7. Had Mr. Owen seen that ad, he could not have reasonably concluded that Boost would keep his blood sugar "steady."

Moreover, Mr. Owen cannot establish deception or injury because his theory is not consistent with his lawyer's theory in this case. Mr. Owen thought his blood sugar would be "steady" after drinking Boost Glucose control because he thought the product had zero sugar, and thus wouldn't have an impact on glucose at all. Loose, Ex. 8 at 66:20–67:5; 94:15–25. The complaint—which Mr. Owen never read, *id.* at 141:18–23—advances a totally incongruent theory: that Boost will "prevent" or "treat" diabetes by always making blood-sugar levels "better," Compl. ¶¶ 50, 79. Mr. Owen himself

---

[4] At a minimum, Mr. Owen's sole reliance on the product name "Boost Glucose Control" means he has "abandoned his challenge to" other label statements "thus narrowing his claims in this lawsuit to those challenging the" product name. *Wilson v. Frito-Lay N. Am., Inc.*, 260 F. Supp. 3d 1202, 1211 (N.D. Cal. 2017) (holding that a plaintiff abandoned claims based on deposition testimony that he did not challenge "any other label statements").

testified that he didn't think Boost or any other food would or could do that, because *no* food or drug could possibly "control" blood sugar levels by always making them "better." Loose, Ex. 8 at 55:20–56:1, 62:8–17, at 65:20–22, 144:23–145:11.  Mr. Owen cannot try to get around this by "raising allegations or theories" at this stage that "differ[] from the one disclosed in the [Consolidated] Complaint." *Major*, 2015 WL 859491, at *4.  The same is true for the allegations in the complaint that Boost was "more expensive than other choices he viewed." Compl. ¶ 79.  Mr. Owen never viewed any "other choices" at all.  Loose, Ex. 8 at 87:15–88:9.  This allegation was baseless and cannot support his claim for having been "injured" by paying a "premium price" for Boost.

*     *     *

Discovery has revealed that none of the Plaintiffs thought Boost would "mitigate, treat, or prevent" diabetes, or make their blood sugar "better," no matter what.  Compl. ¶¶ 50, 77–79.  None of the Plaintiffs were harmed by buying a high-quality nutritional drink that they agreed is a better choice for diabetics than a standard nutritional drink.

## B.     Plaintiffs' "misbranding" theory does not provide an alternate basis for this case to continue.

Plaintiffs' complaint claims the Boost Glucose Control labels are "misbranded" because they allegedly make "health claims" that "require prior testing and approval by the [FDA], which Nestlé has not obtained." Compl. ¶ 4.  In the Ninth Circuit, Plaintiffs argued that this "misbranding" theory constituted an independent basis for their claims, separate and apart from their allegations that the Boost labels are misleading or fraudulent. *See Horti v. Nestlé Healthcare Nutrition, Inc.*, No. 22-16832 (9th Cir.) Dkt. 15 at 39–47.  That argument is wrong for two reasons. *First*, as a matter of law, the Boost labels do not make any "health claims" as that term is used in the Food, Drug, and Cosmetic Act ("FDCA"). *Second*, even if Plaintiffs could establish any violation of the FDCA, they do not have standing to enforce regulatory requirements in the absence of any concrete injury, which they cannot establish in this case given their sworn testimony.

### 1.     The Boost labels do not make "health claims" under the FDCA.

At a basic level, a "health claim" under the FDCA is a claim that a substance can reduce the risk of disease or health condition—for instance:  "fiber may reduce the risk of heart disease."  FDA

regulations define a "health claim" as "any claim made on the label or in labeling of a food . . . that expressly or by implication . . . characterizes the relationship of any substance to a disease or health-related condition." 21 C.F.R. § 101.14(a)(1). Importantly, health claims are "limited to claims about disease *risk reduction*, and cannot be claims about the diagnosis, cure, mitigation or treatment of disease." FDA, *Guidance for Industry: A Food Labeling Guide*, at 81 (Jan. 2013) (emphasis added).[5] In other words, health claims do not include statements about "treatment of a person's *existing disease*," but instead only "claims of prevention rather than ones of treatment." *Whitaker v. Thompson*, 353 F.3d 947, 951 (D.C. Cir. 2004) (emphasis added). Determining whether a label makes a "health claim," requires considering "the context of the whole label" rather than any "statement in isolation." *Magpayo v. Walmart Inc.*, 2024 WL 4529343, at *5 (N.D. Cal. Oct. 18, 2024).

Plaintiffs claim that the Boost labels make three "health claims": (1) "designed for people with diabetes"; (2) the name of the product, "Boost Glucose Control"; and (3) "helps manage blood sugar ♦." Compl. ¶ 34. Taken together, none of these statements constitute a "health claim." The label (for some versions of the product) states the product is "designed for people *with* diabetes"—not that it reduces the *risk* of contracting diabetes among those who do not already have it. The fact that the product is called "Boost Glucose Control" and "helps manage blood sugar ♦" for people *with* diabetes makes no claim about the product's ability to reduce the risk of developing diabetes among those who do not already have it. This is especially true when these statements are read with the corresponding statement associated with the ♦: "Clinically shown to produce a lower blood sugar response vs. a standard nutritional drink in people with type 2 diabetes. Incorporate into a balanced diet as part of a medically supervised diabetes management plan. **Not a substitute for medication**." Unsurprisingly, given this language, the FDA itself has never asserted that the Boost label makes "health claims," nor raised any issues with the Boost labels at all. Loose, Ex. 1 at 216:8–11.

Because none of the challenged statements make "claims of prevention," they do not constitute "health claims" under the FDCA, and thus cannot support Plaintiffs' argument that the Boost drinks are misbranded. *Whitaker*, 353 F.3d at 951.

---

[5] Accessible at https://www.fda.gov/files/food/published/Food-Labeling-Guide-%28PDF%29.pdf.

1    **2.    Plaintiffs cannot sustain a lawsuit based solely on a regulatory violation.**

2        Even if Plaintiffs could point to some technical regulatory violation on the Boost labels, they

3    still would have no basis to maintain a claim in federal court.  A "lawsuit may not proceed" where the

4    "plaintiff has not suffered any physical, monetary, or cognizable intangible harm."  *TransUnion LLC*

5    *v. Ramirez*, 594 U.S. 413, 427 (2021).  "[M]erely seeking to ensure a defendant's 'compliance with

6    regulatory law'" does not count as such an injury and is "not grounds for Article III standing."  *Id.*

7    at 427–28; *see also id.* at 429 ("Private plaintiffs are not . . . charged with pursuing the public interest

8    in enforcing a defendant's general compliance with regulatory law.").  Instead, to establish standing,

9    an alleged injury "must consist of more than a statutory violation."  *Winsor v. Sequoia Benefits & Ins.*

10    *Servs. LLC*, 2021 WL 5053087, at *4 (N.D. Cal. Nov. 1, 2021), *aff'd*, 62 F.4th 517 (9th Cir. 2023).

11        As demonstrated above, Plaintiffs were not deceived by the Boost labels and have suffered no

12    financial harm.  *See supra* at pp. 14–20.  Accordingly, any allegations that the Boost labels are

13    "misbranded" constitutes at most an "injury in law"—"not an injury in fact"—which is not enough to

14    confer standing.  *TransUnion*, 594 U.S. at 427; *see also Spokeo*, 578 U.S. at 341 ("Article III standing

15    requires a concrete injury even in the context of a statutory violation.").  Because Plaintiffs have not

16    suffered an injury in fact, even if the Boost labels were "misbranded" under FDA regulations, this

17    theory cannot justify continuing their suit.

18    **C.    Plaintiffs do not have standing to seek prospective injunctive relief.**

19        At a minimum, Plaintiffs do not have standing to seek prospective injunctive relief because they

20    have not demonstrated "an imminent or actual threat of future harm due to [the alleged] false

21    advertising."  *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018).  In some instances,

22    consumers may have standing to challenge labeling they allege to be false if they have actual plans to

23    purchase the product and will have "no way of determining whether" the labeling is true, and thus will

24    be "unable to rely on the product's advertising or labeling in the future."  *Id.* at 969–70, 972.  Plaintiffs

25    cannot meet that standard here for two reasons:  they have no plans to buy Boost again, and they cannot

26    possibly be deceived again in the future.

27        *First*, Plaintiffs' claims for injunctive relief fall flat because all three Plaintiffs admit they have

28    no plans to buy Boost again in the future.  A plaintiff seeking injunctive relief cannot rely on a "some

day intention," and instead must "*prove* they want to or intend to purchase the product in the future." *Morizur v. Seaworld Parks & Ent., Inc.*, 2020 WL 6044043, at *12 (N.D. Cal. Oct. 13, 2020) (emphasis added); *accord, e.g.*, *Julian v. TTE Tech., Inc.*, 2021 WL 810228, at *8–9 (N.D. Cal. Mar. 3, 2021). All three Plaintiffs have made clear they have no concrete plans to ever buy Boost again:

- Ms. George testified that she did not know if she would ever buy the drinks again, and when asked if "any change to the label [would] matter if you're deciding to buy it again in the future," she said "probably not." Loose, Ex. 6 at 165:25–167:23.

- Mr. Horti did not know if he would ever buy Boost again in the future, and only "might" buy it if the company "improved" the formulation of the drink, though he could not say what kind of improvements he would want to see to get him to buy again. Loose, Ex. 7 at 171:16–172:11.

- Mr. Owen, when asked if he "plan[s] to buy Boost Glucose Control again," responded with a resolute "No." Loose, Ex. 8 at 78:9–10. He did not like how the product tasted, and doesn't like nutritional drinks at all. *Id.* at 98:15–24.

This unambiguous testimony makes clear none of the Plaintiffs has a basis to seek injunctive relief. *See Graham v. Cent. Garden & Pet Co.*, 2023 WL 2744391, at *4 (N.D. Cal. Mar. 30, 2023) (no injunctive relief where the plaintiff "does not allege she will purchase the products again").

*Second*, Plaintiffs do not have standing to seek injunctive relief because they cannot reasonably claim to have no way of determining whether or not the Boost drinks will "treat, or prevent prediabetes or diabetes" in the future. Compl. ¶ 5. A plaintiff cannot reasonably claim to have "no way of determining" the underlying truth of a representation when they can "simply look at the label . . . and put it back." *Shanks v. Jarrow Formulas, Inc.*, 2019 WL 7905745, at *4 (C.D. Cal. Dec. 27, 2019); *Matic v. United States Nutrition, Inc.*, 2019 WL 3084335, at *7 (C.D. Cal. Mar. 27, 2019) (finding plaintiff lacked standing because he now "knows precisely where to find" information on the label).

Here, all three Plaintiffs conceded that *no* food or drink will always make blood sugar "better," contrary to what is alleged in the complaint. *See supra* at pp. 9–13. And all three Plaintiffs acknowledged that *any* food or drink that contains sugar will necessarily cause blood-sugar levels to rise. *See id.* Unlike the plaintiff in *Davidson*, who could not easily determine whether "flushable" wipes were actually flushable without buying the wipes and trying to flush them, Plaintiffs here do not

1    need to purchase Boost again to determine whether the beverage will have an "affirmatively

2    therapeutic" effect on their blood sugar—they just need to look at the bold, front-label disclosures and

3    access their own common sense to conclude that the Boost drinks contain sugar and will cause their

4    blood-sugar levels to gradually rise.  *Compare with Shanks*, 2019 WL 7905745, at *5 (no standing for

5    injunctive relief where the consumer could "look at the back of the label and easily determine whether

6    the product still contains 14 grams of fat and 13 grams of saturated fat").

7            In short, Plaintiffs do not have plans to buy Boost Glucose Control again in the future, and if

8    they do decide to make such a purchase, they will be able to readily determine what effect those drinks

9    will have on their blood sugar by looking at the front-label statements showing the drinks have sugar.

10   They thus have no basis to seek injunctive relief to change the Boost labels.

11                                              **V.  CONCLUSION**

12           False-advertising laws exist to provide recourse for consumers who are actually and reasonably

13   deceived into paying too much for an inferior product.  Plaintiffs' own testimony shows they were not

14   deceived by the Boost Glucose Control labels, and did not interpret those labels to make the pie-in-the-

15   sky promises their lawyers alleged in the complaint.  Instead, Plaintiffs all paid for and received high-

16   quality nutritional drinks that they agreed are better for people with diabetes than standard nutritional

17   drinks.  Because Plaintiffs were not deceived and suffered no injury, they cannot maintain claims on

18   their own behalf, much less on behalf of a class.  Accordingly, Defendant Nestlé Healthcare Nutrition,

19   Inc. respectfully requests that the Court grant summary judgment in its favor on all of Plaintiffs' claims.

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DATED: February 7, 2025

By: */s/ Timothy W. Loose*
Christopher Chorba, SBN 216692
CChorba@gibsondunn.com
Perlette M. Jura, SBN 242332
PJura@gibsondunn.com
Timothy W. Loose, SBN 241037
TLoose@gibsondunn.com
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7746

Al Kelly (*pro hac vice*)
AKelly@gibsondunn.com
Gibson, Dunn & Crutcher LLP
1801 California Street Suite 4200
Denver, Colorado 80202
(303) 298-5700

*Attorneys for Defendant Nestlé Healthcare Nutrition, Inc.*