Trenton R. Kashima (SBN 291405)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
402 West Broadway, Suite 1760
San Diego, CA 91942
Telephone: (619) 810-7047
Email: tkashima@milberg.com

**KAPLAN FOX & KILSHEIMER LLP**
Laurence D. King (SBN 206423)
Matthew B. George (SBN 239322)
Blair E. Reed (SBN 316791)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone: (415) 772-4700
Facsimile: (415) 772-4707
*lking@kaplanfox.com*
*mgeorgef@kaplanfox.com*
*breed@kaplanfox.com*

*Attorney for Plaintiffs*
*and the putative Classes*

[*Additional attorneys on signature page*]

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE: NESTLE BOOST NUTRITIONAL DRINK LITIGATION** | Case No. 4:21-cv-09812-JSC<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO THE NAMED PLAINTIFFS**<br><br>Date: March 27, 2025<br>Time: 10:00 a.m.<br>Location: Courtroom 8 – 19th Floor<br>Judge: Hon. Jacqueline Scott Corley<br><br>Date Action Filed: February 4, 2022 |

**\* \* \* REDACTED FOR PUBLIC FILING \* \* \***

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page(s)**

TABLE OF CONTENTS ........................................................................................................................ i

TABLE OF AUTHORITIES .............................................................................................................. ii

I.     INTRODUCTION ................................................................................................................... 1

II.    BACKGROUND ..................................................................................................................... 4

   A.   Defendant's Labels ............................................................................................................ 4

   B.   Defendant's Marketing Practices ...................................................................................... 4

   C.   Defendant's Marketing Research ....................................................................................... 7

III.   LEGAL STANDARD ............................................................................................................. 8

IV.    ARGUMENT ........................................................................................................................... 9

   A.   Evidentary Objections ........................................................................................................ 9

   B.   Plaintiffs' Depositions Establish They Have Standing and Support their Claim ................. 10

      1.   Bruce Horti ................................................................................................................. 10

      2.   Sandra George ............................................................................................................ 14

      3.   Stephen Owen .............................................................................................................. 16

   C.   The Boost Labels Do Make Health Claims Under the FDCA. ........................................... 18

   D.   Plaintiffs Can Sustain A FDCA Violation And Have Done So. .......................................... 22

V.     CONCLUSION ...................................................................................................................... 24

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albino v. Baca,*
  747 F.3d 1162 (9th Cir. 2014) .................................................................................. 8

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ................................................................................................ 8

*Brady v. Bayer Corp.,*
  26 Cal. App. 5th 1156 (2018) ................................................................................ 14

*Bruno v. Quten Rsch. Inst., LLC,*
  280 F.R.D. 524 (C.D. Cal. 2011) ......................................................................... 23

*Bush v. Rust-Oleum Corp.,*
  No. 20-CV-03268-LB, 2024 WL 308263 (N.D. Cal. Jan. 26, 2024) ..................... 12

*Carmen v. San Francisco Unified School Dist.,*
  237 F.3d 1026 (9th Cir. 2001) ................................................................................ 9

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ............................................................................................. 8, 9

*Chowning v. Kohl's Dep't Stores, Inc.,*
  No. CV 15-08673 RGK, 2016 WL 1072129 (C.D. Cal. Mar. 15, 2016) .................. 11

*Cohan v. Provident Life & Accident Ins. Co.,*
  140 F. Supp. 3d 1063 (D. Nev. 2015) ..................................................................... 9

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach,*
  657 F.3d 936 (9th Cir. 2011) ................................................................................... 8

*Ebner v. Fresh, Inc.,*
  838 F.3d 958 (9th Cir. 2016) ................................................................................. 11

*Hadley v. Kellogg Sales Co.,*
  243 F. Supp. 3d 1074 (N.D. Cal. 2017) ................................................................ 20

*Hinojos v. Kohl's Corp.,*
  718 F.3d 1098 (9th Cir. 2013) ............................................................................... 23

*Horti v. Nestle Healthcare Nutrition, Inc.,*
  No. 22-16832, 2023 WL 8613601 (9th Cir. Dec. 13, 2023) ................................. 3, 14

*In re Oracle Corp. Sec. Litig.,*
  627 F.3d 376 (9th Cir. 2010) ................................................................................... 8

*In re Tobacco II Cases,*
  46 Cal. 4th 298 (2009) .......................................................................................... 11

*Kasky v. Nike, Inc.,*
  27 Cal. 4th 939 (2002), *as modified* (May 22, 2002) ............................................. 11

*Krueger v. Wyeth, Inc.*,
   396 F. Supp. 3d 931 (S.D. Cal. 2019) ........................................................ 11

*Kwikset Corp. v. Sup. Ct.*,
   51 Cal. 4th 310 (2011) ................................................................... 10, 11

*Linear Tech. Corp. v. Applied Materials, Inc.*,
   152 Cal. App. 4th 115 (2007) ............................................................. 11

*Major v. Ocean Spray Cranberries, Inc.*,
   No. 5:12-CV-03067-EJD, 2015 WL 859491 (N.D. Cal. Feb. 26, 2015) ................. 15

*Mariscal v. Graco, Inc.*,
   52 F. Supp. 3d 973 (N.D. Cal. 2014) ...................................................... 22

*Maya v. Centex Corp.*,
   658 F.3d 1060 (9th Cir. 2011) ............................................................. 3

*Pettersen v. Circle K Stores*, Inc.,
   No. 321CV00237RBM, 2022 WL 17974463 (S.D. Cal. Nov. 23, 2022) ................. 21

*Prescott v. TC Heartland, LLC*,
   No. 23-CV-04192-PCP, 2024 WL 3463826 (N.D. Cal. July 18, 2024) ................. 13

*Ries v. Arizona Beverages USA LLC*,
   287 F.R.D. 523 (N.D. Cal. 2012) ...................................................... 17, 23

*Schneider v. Chipotle Mexican Grill, Inc.*,
   328 F.R.D. 520 (N.D. Cal. 2018) .......................................................... 17

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ........................................................................ 23

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ........................................................................ 23

*Whitaker v. Thompson*,
   353 F.3d 947 (D.C. Cir. 2004) ............................................................ 21

*Whiteside v. Kimberly Clark Corp.*,
   108 F.4th 771 (9th Cir. 2024) ............................................................. 14

*Williams v. Gerber Prod. Co.*,
   552 F.3d 934 (9th Cir. 2008) ........................................... 11, 13, 14, 22

*Wilson v. Frito-Lay N. Am., Inc.*,
   260 F.Supp.3d 1202 (N.D. Cal. 2017) ..................................................... 15

*Zeiger v. WellPet LLC*,
   526 F. Supp. 3d 652 (N.D. Cal. 2021) .................................................... 12

**Statutes**

21 U.S.C. § 301 .................................................................................. 1

21 U.S.C. § 321 ................................................................................ 21

21 U.S.C. § 343 ................................................................................ 18, 20, 21

Cal. Health & Safety Code § 110100 ............................................................ 18

**Other Authorities**

Food Labeling; General Requirements for Health Claims for Food, 58 FR 2478 at 2483 ............... 18

Qualified Health Claims: Letter of Enforcement Discretion - Chromium Picolinate and Insulin Resistance (Docket No. 2004Q-0144) ........................................................ 21

Revocation of Certain Regulations Affecting Food, 61 FR 27771-01 ............................. 20

**Rules**

Fed. R. Civ. Pro. 26 .......................................................................... 20

Fed. R. Civ. Pro. 56 ......................................................................... 8, 9

Fed. Rule Evid. § 1002 ......................................................................... 9

Fed. Rule Evid. § 1003 ......................................................................... 9

Fed. Rule Evid. § 602 .......................................................................... 9

Fed. Rule Evid. § 701 .......................................................................... 9

Fed. Rule Evid. § 702 .......................................................................... 9

Fed. Rule Evid. § 802 .......................................................................... 9

Fed. Rule Evid. § 901 .......................................................................... 9

**Regulations**

21 C.F.R. § 101.14 .................................................................... 1, 2, 18, 20

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I.    **INTRODUCTION**

Defendant Nestlé Healthcare Nutrition, Inc. markets and distributes the BOOST Glucose Control and BOOST Glucose Control High Protein Nutritional Drinks (collectively, the "Glucose Control Products" or "Products") in packaging that prominently displays that the Products "help[ ] manage blood sugar" and are "designed for people with diabetes."[1] Plaintiffs Bruce Horti, Sandra George, and Stephen Owen allege that the name of the Products ("Boost Glucose Control") and the other challenged statements imply that the Glucose Control Products can help control blood glucose levels, *i.e.*, help keeping them within an acceptable range. Essentially, Defendant marketed that the Glucose Control Products are not merely nutritional drinks, but are clinically effective in managing blood sugar, the principal concern of diabetics.

However, as demonstrated by Defendant's own studies, the Glucose Control Products do not have any therapeutic qualities. Instead, the Boost Glucose Control Products are merely "reduced sugar" or "diet" versions of Nestle's regular BOOST-branded nutritional drinks. And like most other foods or beverages, the Products' ingestion is associated with a spike in blood glucose levels. Nevertheless, by marketing a '"diet" drink as "Glucose Control," "helps manage blood sugar," and "designed for people with diabetes," Nestle can charge a price premium for the Boost Glucose Control Products when compared to other nutritional drinks.

Such claims are not novel or even particularly creative. Food and dietary supplement manufacturers have long marketed products using the inference that their consumption will help mitigate a variety of common ailments. But the law has also long since evolved, developing prohibitions against the sale of "snake-oil" cures. And while Defendant's version of this deceptive business practice is more nuanced than other turn-of-the-century "miracle cures," it is no less harmful to the consumers. This is why the Food Drug and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301 *et seq.*, and its resulting regulations, forbid this exact method of marketing. Given the historical prevalence of misleading "medical" claims on foods and drinks, the FDCA prohibits manufacturers from making "health claims" unless such claims are expressly authorized by the Food and Drug Administration ("FDA"). *See* 21 C.F.R. § 101.14(e). The FDA defines "health claim" relatively broadly to accomplish

---

[1] Collectively, the "Glucose Control," "Designed for people with diabetes," and "Helps manage blood sugar" claims are referred to as the "Challenged Statements."

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

this goal:

> any claim made on the label or in labeling of a food, including a dietary supplement, that expressly or by implication, including "third party" references, written statements (e.g., a brand name including a term such as "heart"), symbols (e.g., a heart symbol), or vignettes, characterizes the relationship of any substance to a disease or health-related condition. Implied health claims include those statements, symbols, vignettes, or other forms of communication that suggest, within the context in which they are presented, that a relationship exists between the presence or level of a substance in the food and a disease or health-related condition.

21 C.F.R. § 101.14(a)(1).

Thus, Plaintiffs' claims should not be controversial. Plaintiffs simply allege that they, and other reasonable consumers, would assign the normal meaning to the Challenged Statements: when a nutritional drink is named "Glucose Control," and it is described as being able to "help[ ] manage blood sugar" and "designed for people with diabete:" that the product must have some positive effect on controlling and managing blood sugar levels (the main concern of those with diabetes).[2] A reasonable consumer would not interpret such specific language to mean that the Products are merely "diet" or "reduced sugar."

Yet, this is what Defendant now claims in its Motion for Summary Judgment (the "Motion"), ECF No. 83. Defendant claims that people would read the Challenged Statements only to mean that their Products have less sugar and carbohydrates, therefore are associated with a smaller post-ingestion glucose spike. But the words "Glucose Control" on a nutritional drink, especially on products marketed for diabetics, denote something different than it is just a low calorie or low sugar beverage. Reasonable consumers do not equate Diet Coke as "diabetic glucose control Coke" and there is no "Pepsi designed for Diabetics," just Diet Pepsi. Nor should consumers equate "Boost Glucose Control" with what is essentially a "diet" Boost drink. Defendant cannot side-step Plaintiffs' claims by ignoring the actual allegations.

Plaintiffs, through grueling deposition testimony, have established they have been harmed and deceived based on the labels of the Glucose Control Products. Indeed, each Plaintiff testified that they relied on Defendant's representations that the Glucose Control Products would control their glucose

---

[2] Nor are Plaintiffs claiming that a reasonable consumer would interpret the Challenged Statements as suggesting these nutritional drinks would cure diabetes. Again, Plaintiffs are only claiming that the Product would have a positive effect in managing blood sugar levels.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

or blood sugar. For example, Plaintiff Horti testified he purchased the product because it was good for him: "BOOST was a good name and I thought that being glucose control would be good for me. . . [s]o I thought, well, I think that might be a good thing. . . I thought, well it'd be –it's supposed to be better for me. . . I might go with that one." Kashima Decl., Ex. E [Horti Depo] at 120:9-17, 66:11-14. Likewise, Plaintiff George testified she relied on the representations "[d]esigned for people with diabetes" and "glucose control" (Kashima Decl., Ex. G [George Depo] at 136:20-23, 207:5-12, 35:17-20) and testified those representations are why she purchased the Glucose Control Products. *Id.* at 136:20-137:24, 207:5-12. Finally, Plaintiff Owen testified that he relied upon the Boost Glucose Control representation, he also looked at the label and understood in the context of the label that it would "control sugar." Kashima Decl., Ex. F [Owen Depo], 17:19-18:4, 19:3-5, 21:1-6.

Just as the Ninth Circuit has already held in this case, Plaintiffs had and continue to have standing to pursue their claims. *Horti v. Nestle Healthcare Nutrition, Inc.*, No. 22-16832, 2023 WL 8613601, at *1 (9th Cir. Dec. 13, 2023) (quoting *Maya v. Centex Corp.*, 658 F.3d 1060, 1069 (9th Cir. 2011)) ("[b]ecause the plaintiffs claim that they 'spent money that, absent defendant['s] actions, they would not have spent,' they have pleaded 'a quintessential injury-in-fact' to support Article III standing. . . plaintiffs sufficiently alleged an injury in fact at the pleading stage through their price premium allegations."). Nothing has changed since the Ninth Circuit's ruling as Plaintiffs have testified they were in fact deceived by the Product labels, and suffered financial losses as a result.

Further, Plaintiffs have shown Defendant's violation of FCCA and accompanying FDA regulations involving explicit and implicit health claims that caused them corresponding harm. It is not subject to dispute that each of the Challenged Statements on the Products' labels specifically ties the Glucose Control Products to health claims regarding diabetes:

- "Designed for people with diabetes" is an express health claim, claiming a relationship between the drink and diabetes.

- The name of the Product, "BOOST Glucose Control," is an implicit or express health claim because it purports to control a health-related condition, namely glucose levels "for people with diabetes."

- "Helps manage blood sugar" is an implicit or express health claim because it purports to manage a health-related condition, namely the inability to manage blood sugar levels.

Therefore, Defendant's motion should be denied.

## II.    BACKGROUND

### A.    Defendant's Labels

Defendant's labels have changed slightly over time. However, the underlying message has remained the same. Using Defendant's Boost Glucose Control Six-Pack (Chocolate), as an exemplar, starting in 2017, Defendant advertised its Products as "Nutrition for People with Diabetes" and branded it as "Glucose Control." Declaration of Trenton Kashima ("Kashima Decl."), Ex. J, Stipulation Re: Undisputed Facts, ECF No. 79 ("Label Stip."). There was no disclaimer on this original version of the label. In December 2019, Defendant changed its label. *See* Label Stip. The "Glucose Control" remained, but the Products were now advertised as "Designed for People with Diabetes" and "Helps Manage Blood Sugar♦." Kashima Decl., Ex. K, Label Stip. The ♦ asterisk led to the following disclaimer on the back of the Product: "BOOST GLUCOSE CONTROL Balanced Nutritional Drink is clinically shown to produce a lower blood sugar response vs. a standard nutritional drink in people with type 2 diabetes." *Id.* In June of 2021, the "Designed for People with Diabetes" was removed from the label. Kashima Decl., Ex. M, Label Stip. And in December 2021, Defendant added the "Not a substitute for medication" statement to the asterisked disclaimer. Kashima Decl., Ex. N, Label Stip. On each of these labels, Defendant uses the DBA name of "Nestle HealthScience." Kashima Decl., Appendix A.

For the Court's reference, an Appendix of the relevant labels discussed above is attached to the Kashima Declaration. Kashima Decl., Appendix A.

### B.    Defendant's Marketing Practices

Defendant admits that it ████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ███████████████████████████████ Kashima Decl., Ex. D, at 50:9-52:4. The Glucose Control Products differ from other "Boost" branded nutritional drinks in that they had a patented blend of carbs, protein, and fat, and have twenty-five vitamins and minerals, including chromium. *Id.*, at 60:4-22.[3] Given these attributes, Defendant claims that the Glucose Control Products have a "lower glycemic response than a standard nutritional drink." *Id.* Here, it is undisputed that Defendant

---

[3] This "patented blend" was a one to one-to-one ratio of protein, fat and carbs, with lower sugar content. Kashima Decl., Ex. B, at 126:17-127:5.

4

marketed its Glucose Control Products as a drink to help diabetics managing their blood sugar levels.

██████████████████████████████████████████████████████████

████████. *Id.*, Ex. B, at 141:7-18.

To substantiate its claim that that the Glucose Control Products "helps manage blood sugar," are "designed/nutrition for people with diabetes," and control glucose, Defendant compared the Glucose Control Products to the "original" Boost nutritional drinks. *Id.*, Ex. D, at 50:9-51:2; *See also* Declaration of Timothy Loose, ECF No. 84, ("Loose Decl."), Ex. 13, at ECF p. 4; Ex. 14 at ECF p. 4. However, this is a disingenuous comparison. The "original" Boost nutritional drinks have 37 grams of total carbohydrates, including 15 grams of added sugars. Kashima Decl, Ex. H. To put this in perspective, Defendant's "Nesquik" branded Lowfat Chocolate Milk only has 23 grams of total carbohydrates, including 11 grams of added sugars, for the same serving size. *Id.*, Ex. I. Essentially, to show that the Glucose Control Products "help manage blood sugar," Defendant's studies compared it to a fortified milk shake. And Defendant does not disclose the name of the comparable "standard nutritional drink" that it uses for comparison on the labels of the Glucose Control Products. *Id.*, Exs. J-O.

Defendant's own studies show that there is no benefit to drinking the Glucose Control Products on blood glucose levels when compared to other "reduced carbohydrate products." Kashima Decl., Ex. D, at 66:3-72:6, 75:1-77:14, *see also* Ex. D, Ex. 6 at 77; *see also* Loose Decl., Ex. 11. Put differently, the Glucose Control Products do not "help manage blood sugar" or control glucose any more than another low carb or diet drink. Internal communications suggest that Defendant's own employees had some concerns regarding this comparison. ██████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████ Kashima Decl., Ex. D, at 46:19-47:19, 56:3-57:7, *see also* Ex. D, Ex. 4]. Indeed, another of Defendant's employees, ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█ ██████████████████████████████████████████████

5

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

███████████████████████████████████████████████████

*Id.*, Ex. B at 185:16-193:14, , Ex. B, Ex. 21]. One of Defendant's employees even noted that the "Boost Glucose" statement would be "generally understood to mean the goal of keeping blood sugar levels within a certain range the greatest amount of time possible." *Id.*, Ex. D at 97:19-98:15. Evidently, even Defendant's own employees knew that the Challenged Statements had the ability to mislead consumers into believing that the Products had ███████████████████████████

This directly supports Plaintiffs' allegations. Plaintiffs specifically alleged that:

> Nestle's marketing is designed to play on reasonable consumer expectations based on consumer experiences with packaged nutritional foods, which rarely feature the names of diseases or the underlying mechanism of diseases. When consumers see the name of a disease on a nutritional product, they reasonably expect that the product has received regulatory approval, or, if not, has been rigorously tested for efficacy, like other products that make health claims, including over the counter medications. Moreover, the marketing of "reduced sugar" "reduced calorie" or "diet" is ubiquitous, and these are never marketed to provide diabetes benefits. Diet Coke is not advertised as "diabetic glucose control Coke," and there is no "Pepsi Diabetes." With tens of millions of Americans diagnosed with diabetes or prediabetes, and millions more who are apprehensive about getting diabetes or prediabetes, the consumer diabetes market is enormous and presents clear potential for profit. If companies could legally market nutritional products expressly to diabetics just by lowering the sugar content, stores would be filled with such products. They are not because FDA regulations do not allow it (21 C.F.R. § 101.14(a)(1)), and because to do so would be misleading. While average consumers do not know the specific regulations that account for the non-existence of disease-names on nutritional products, they experience the effects of the regulations when they shop. The absence of diabetes-marketing on low sugar or diet products conditions consumers to reasonably expect that a product that expressly markets itself to diabetics has scientifically proven ingredients that support the marketing, not that it is simply lower in sugar.

Complaint, ¶ 61.

These concerns are only compounded by Defendant's marketing strategy for the Glucose Control Products. Defendant's reference their television advertising in the Motion, but this is not the only method of marketing utilized. *See* Kashima Decl., Ex. B at 64:25-66:8 (██████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████. *Id.*, Ex. B at 215:18-216:10. ██████████████

██████████████████████████████████████████████████

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1  ███████████████████████████████████████████████

2  ███████████████████████████████████████████████

3  ███████████████████████████████████████████████

4  ███████████████████████████████████████████████

5  ███████████████████████████████████████████████

6  ███████████████████████████ *Id.*, Ex. B at 205:18-213:17, 241:15-242:7, 241:15-

7  244:21.

8      Defendant had other methods to target diabetics. ████████████████

9  ███████████████████████████████████████████████

10 ███████████████████████████████████████████████

11 ███████████████████████████████████████████████

12 ████  *Id.*,  Ex.  B  at  216:11-219:13. ████████████████████████

13 ███████████████████████████████████████████████

14 ███████████████████ *Id.*, Ex. B at 232:1-234:16. █████████████

15 ██████████████████████████████

16      **C.    Defendant's Marketing Research**

17 ██████████████████████████████████████████████

18 *Id.*, Ex. B at 133:11-18, 136:23-137:25, 181:21-183:22.

19 ██████████████████████████████████████████████

20 ██████  *Id.*,  Ex.  B  at  141:19-142:10,  156:4-157:21. ████████

21 ██████████████████████████████████████████████

22 ██████████████████████████████████████████████

23 █████████████████████████████████ *Id.*, Ex. B at 141:19-142:10,

24 147:10-18, Ex. B, Ex. 16 at p. 50 (p. 45 of the PDF). ████████████

25 ██████████████████████████████████████████████

26 ███████████████████████████████████████ *Id.*, Ex. B, Ex.

27 16 at p. 50 (p. 45 of the PDF). ████████████████████

28 ██████████████████████████████████████████████

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1 ███████████████████████████████████████████████

2 ████████████████████████████ *Id.,* Ex. B at 156:1-21, Ex. B, Ex. 17 at p. 13. █

3 ███████████████████████████████████████████████

4 ███████████████████████████ *Id.* ██████████████████

5 ███████████████████████████████████████████████

6 ███████████████████████████████████████████████

7 ███████████████████████████████████████████████

8 ██████████████████████████████████████

## III.   LEGAL STANDARD

Summary judgment in favor of a party is appropriate when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a); *Albino v. Baca*, 747 F.3d 1162, 1169 (9th Cir. 2014) (*en banc*). A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. Pro. 56(c)).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). If the moving party does so, "the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial," which is not a light burden, the party "must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.*; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In reviewing the evidence at the summary judgment stage, the Court "must draw all reasonable inferences in the light most favorable to the nonmoving party." *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011). It need only draw inferences, however, where there is "evidence in the record ... from which a reasonable inference ... may be

drawn"; the Court need not entertain inferences that are unsupported by fact. *Celotex*, 477 U.S. at 330 n. 2 (citation omitted). In reviewing a summary judgment motion, the Court may consider other materials in the record not cited to by the parties but is not required to do so. Fed. R. Civ. Pro. 56(c)(3); *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).

## IV. <u>ARGUMENT</u>

### A.    Evidentary Objections

Pursuant to Local Rule 7-3, Plaintiffs object to Exhibits 9-15 of the Declaration of Timothy Loose, ECF No. 84, as follows:

Exhibit 19 is a printout from the Internet Archive's Wayback Machine, reflecting the Amazon product page for Boost Glucose Control as it existed on March 12, 2022. Plaintiffs object that the Declarant has no personal knowledge of the webpage at issue, or the Wayback Machine archiving of the website, nor has any foundation of the document been laid. Fed. Rule Evid. §§ 602, 701, 901; *Cohan v. Provident Life & Accident Ins. Co.*, 140 F. Supp. 3d 1063, 1075 (D. Nev. 2015) ("[E]ven pursuant to Rule 901(b)(4), counsel must have personal knowledge regarding the underlying document. In short, a mere declaration that an exhibit is a true and correct copy of a document, absent any declaration of personal knowledge establishing the authenticity of the original document, is insufficient."). This document is hearsay within hearsay, to the extent that this archival copy of Amazon.com, from the Wayback Machine, is offered as proof of the contents of the document. Fed. Rule Evid. § 802. Additionally, the document does not show the pictures of the Product's labels, and the Challanged Representations therein, which were available on the Amazon.com. Fed. Rule Evid. §§ 1002-03.

Exhibits 9-15 are documents regarding clinical trials conducted on the Products. Plaintiffs object that the Declarant has no personal knowledge of these trials, or their methods and results, nor has any foundation of the document been laid. Fed. Rule Evid. §§ 602, 701, 901; *Cohan v*, 140 F. Supp. 3d at 1075. These documents are hearsay, to the extent they are offered for the truth of the matter asserted (*i.e.*, the results of the trials). Fed. Rule Evid. § 802. Additionally, when offered by the Declarant, these documents represent improper expert opinion, as they address scientific, technical, or other specialized knowledge beyond the lay knowledge of the Declarant. Fed. Rule Evid. §§ 701-02.

**B.      Plaintiffs' Depositions Establish They Have Standing and Support their Claim**

1.      <u>Bruce Horti</u>

Mr. Horti was diagnosed with pre-diabetes, which is why he chose to buy shakes that were supposedly better for diabetics, such as the Glucose Control Products. Kashima Decl., Ex. E, 60:6-11, 26:25-27:13. He testified he purchased the product because it was good for him: "BOOST was a good name and I thought that being glucose control would be good for me. . . [s]o I thought, well, I think that might be a good thing. . . I thought, well it'd be –it's supposed to be better for me. . . I might go with that one." *Id.,* Ex. E, at 120:6-121:13, 66:8-67:6. In addition, Mr. Horti relied on the Nestle name because he believed they "had a reputation to protect." *Id.,* Ex. E, at 134:18-135:6. Mr. Horti purchased the Glucose Control Products from Costco in cases over a number of years. *Id.,* Ex. E, at 283:5-9, 58:15-19. He purchased the product because he believed the product "would be beneficial" and had "confidence in that manufacturer." *Id.,* Ex. E, at 248:17-249:15. Mr. Horti believed the Glucose Control Products would "control my glucose" and "have some impact…more than just what's the sugar level" (*Id.,* Ex. E, at 274:12-276:11) and "some benefit specifically for diabetics." *Id.,* Ex. E, at 26:25-27:23, 30:24-31:9. Indeed, Mr. Horti testified that he did not expect the Glucose Control Products to be some "miracle" cure for diabetes, but that it would have a positive effect, more than just more then having less sugar. *Id.,* Ex. E, at 155:25-156:24, 275:12-276:11.

Mr. Horti also testified, when asked if there are any other statements that he believes are false on the label, that "the fact that it says, Glucose control. We don't really know what controls your glucose either" and that "[h]elps manage blood sugar, which, again, we're hoping, but we don't know if it does that." *Id.,* Ex. E, at 206:21-207:11. Mr. Horti recalls looking at the label throughout his year of purchases of the Glucose Control Products: "Q. Don't remember anything about the label at all? A.·Oh, I remember the label at various times." *Id.,* Ex. E, at 248:23-25. Because the Glucose Control Products did not function as represented, Mr. Horti is seeking a refund of the Glucose Control Products he purchased from Costco. *Id.,* Ex. E, at 46:12-17.

Here, Mr. Horti suffered a sufficient economic injury to confirm standing. *Kwikset Corp. v. Sup. Ct.,* 51 Cal. 4th 310, 327 (2011) (Plaintiffs can establish standing by showing that they relied on an alleged misrepresentation and would not have purchased the product otherwise). While, Mr. Horti had issues remembering his first purchase, he clearly testified that that he believed that the Glucose

10

1    Control Products would do what it said, and "control my glucose." From this testimony, it is not

2    unreasonable to infer that he read the label, relied on the name of the Glucose Control Products ("Boost

3    Glucose Control"), and it would have some beneficial effect, over just being a "low carb" drink.

4           Defendant's argument that Mr. Horti cannot prove that he even "looked at the labels" is clearly

5    overstated. Motion p. 16. Nothing in Mr. Horti's testimony states that he was oblivious to the name of

6    the product he purchased. Instead, it is the opposite, as Mr. Horti stated that he purchased the Glucose

7    Control Products believing that they would "control my glucose." This is enough. *Chowning v. Kohl's*

8    *Dep't Stores, Inc.*, No. CV 15-08673 RGK, 2016 WL 1072129, at *2-4 (C.D. Cal. Mar. 15, 2016)

9    (denying summary judgment as to causation for UCL standing because there was a triable issue of fact

10   as to reliance on the alleged misrepresentations); *see also Kwikset Corp.*, 51 Cal. 4th at 329

11   (consumers who relies on the truth and accuracy of a label and are deceived have standing); *see also*

12   *In re Tobacco II Cases,* 46 Cal. 4th 298, 326 (2009) (plaintiff not required to show that the

13   misrepresentation was "the sole or even the predominant or decisive factor," but "played a substantial

14   part ... in influencing his decision"). Defendant's citations to cherry-picked passages of Plaintiffs'

15   deposition to suggest otherwise do not warrant summary judgment. *Krueger v. Wyeth, Inc.*, 396 F.

16   Supp. 3d 931, 945 (S.D. Cal. 2019) ("the Court need only find evidence exists on which the fact-finder

17   could reasonably find for the plaintiff."). While Defendant may point to other portions of Mr. Horti's

18   testimony for the opposite position, at most, Defendant raises an issue of credibility, which should be

19   decided by the trier of fact. *Id.* at 941 ("The court may not make credibility determinations, and

20   inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing

21   the motion.").

22          Defendant contends Mr. Horti has not been deceived because the drinks delivered exactly what

23   he expected, and has suffered no injury. Motion p. 17. Claims under the UCL, FAL, and CLRA are,

24   governed by the same reasonable consumer test. *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir.

25   2016); *Williams v. Gerber Prod. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). Under that test, plaintiff will

26   need to show "members of the public are likely to be deceived." *Id.*; *Kasky v. Nike, Inc.*, 27 Cal. 4th

27   939, 951 (2002), *as modified* (May 22, 2002). "Whether a practice is deceptive, fraudulent, or unfair

28   is generally a question of fact which requires consideration and weighing of evidence from both sides."

*Linear Tech. Corp. v. Applied Materials, Inc.*, 152 Cal. App. 4th 115, 134–35 (2007) (internal quotation marks omitted).

Here, Mr. Horti unequivocally testified the Glucose Control Products did not control his glucose (Kashima Decl., Ex. E, at 207: 3-5), was not designed for people with diabetes (*id., at* 205: 9:11, 207: 9-11), or have an impact more than the sugar level (*id., at* 275:1-276:11). Put simply, he did not feel that he got the benefit of his bargain. This is because Mr. Horti stated he believed that the Glucose Control Products would "control my glucose" and "have some impact…more than just what's the sugar level" *Id.,* Ex. E, at 274:12-276:11. And his position is not unreasonable. Even Defendant's own employee believes that the "Glucose Control" statement meant that the Glucose Control Products would "keep blood sugar levels within a certain range the greatest amount of time possible." *Id.,* Ex. D at 97:19-98:15. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *Id.*, Ex. B, at 185:16-193:14, Ex. B, Ex. 21. Nonetheless, whether the product representations are misleading is ultimately a jury question. *See Bush v. Rust-Oleum Corp.*, No. 20-CV-03268-LB, 2024 WL 308263, at *3 (N.D. Cal. Jan. 26, 2024), *appeal denied*, No. 24-913, 2024 WL 1328234 (9th Cir. Mar. 26, 2024), and *reconsideration denied*, No. 20-CV-03268-LB, 2024 WL 1892286 (N.D. Cal. Apr. 29, 2024) ("deposition testimony of individuals — whether those individuals are the named plaintiff, his expert, or anyone else — is at best anecdotal evidence that isn't dispositive of how a reasonable consumer interprets the Challenged Claims . . . [w]hether the plaintiff's asserted definitions are reasonable will be for the jury to decide as part of the overall reasonable-consumer test."); *Zeiger v. WellPet LLC*, 526 F. Supp. 3d 652, 682-683 (N.D. Cal. 2021) ("Zeiger contends that the Wellness Statements are *misleading*, not that there is an *explicit* guarantee. Again, those statements are (1) 'uncompromising nutrition,' (2) 'nothing in excess and everything in balance,' (3) 'complete health,' (4) 'natural,' and (5) 'unrivaled quality standards'. . . [h]ow a reasonable consumer would understand them is a quintessential matter for a jury"). Mr. Horti testified that the core representations on the Glucose Control Products' Label, "Boost Glucose Control" and "designed for people with diabetes," were incorrect. Kashima Decl., Ex. E, at 205:6-11, 207:3-5, 207:8-11. His testimony shows there is a disputed fact about how he (and other reasonable

consumers) would interpret the Challenged Claims. *See Prescott v. TC Heartland, LLC*, No. 23-CV-04192-PCP, 2024 WL 3463826, at *5 (N.D. Cal. July 18, 2024) ("Plaintiffs here allege that the phrases "diabetes care," "suitable for people with diabetes," and "helps manage blood sugar" could mislead a significant portion of reasonable consumers to believe that TC Heartland's Splenda products provide health benefits for diabetics. This is so because words such as "care" and "help" could, according to plaintiffs, imply that the products have a therapeutic effect and provide a health benefit to diabetic consumers.").[4]

Finally, Defendant cites an asterisk on the Glucose Control Products' label, which leads to a back-label disclaimer that the drinks are "clinically shown to produce a lower blood sugar response vs. a standard nutritional drink in people with type 2 diabetes. Not a substitute for medication." Motion p. 18. This does not alter the court's analysis. As noted above, Plaintiffs are not alleging that the Glucose Control Products are a "substitute for medication" or some cure for diabetes. Just that the Glucose Control Products would have some beneficial effect on blood sugar levels, other than those benefits related to being a "low-carb" or "diet" drink. This disclaimer does not prevent such a misunderstanding. *Williams,* 552 F.3d at 938 ("The UCL, FAL, and CLRA "prohibit 'not only advertising which is false, but also advertising which [,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'"). Additionally, this disclaimer does not disclose that the "standard nutritional drink" used in the study has more carbohydrates than Defendant's chocolate milk products (*compare* Kashima Decl. Ex. H [Boost's Website] *with* Ex. I [Nesquik's Website]) and that the Glucose Control Products provide no benefit when compared to other low-carb options. *Id*., Ex. D at 66:3-72:6, 75:1-77:14, Ex. D, Ex. 6] at 77; *see also* Loose Decl., Ex. 11. As Mr. Horti testified, he was looking for more than a low-sugar product when he purchased the Glucose Control Products, but something that would help control his glucose levels. *Id*., Exs. E at 274:12-275:1. There is clear evidence that a reasonable consumer could be misled, despite the disclaimer.

---

[4] *Prescott* is particularly instructive. Like this case, the *Prescott* defendant claimed that their "diabetes care" drink was "not misleading to a significant portion of reasonable consumers because the Splenda products literally do not contain real sugar, which otherwise would exacerbate diabetes." *Id.,* 2024 WL 3463826, at *6. But, the Court correctly noted that a reasonable consumer's interpretation of such language is an issue of fact, not suitable for determination by the Court. *Id.*

Regardless, the Ninth Circuit already held, "[a] reasonable consumer could understand these representations to indicate that the product will have a positive effect on diabetes and blood sugar levels." *Horti*, 2023 WL 8613601, at *1. And a consumer should not be "expected to look beyond misleading representations on the front of the box to discover the truth" about the Glucose Control Products. *Williams,* 552 F.3d at 940.[5]

Here, whether a label is deceptive is a factual determination best left for the trier of fact. *Brady v. Bayer Corp.*, 26 Cal. App. 5th 1156, 1164 (2018).[6] Given the conflicting evidence, the Court should reserve judgment for the jury.

## 2. Sandra George

Ms. George is a Typic 2 diabetic. Kashima Decl., Ex. G, at 96:18-20. She bought the Glucose Control Products from a nearby Walmart or CVS. *Id.* Ex. G, at 49:14-15. She relied on the representations "[d]esigned for people with diabetes" and "glucose control" (*Id.* Ex. G, at 136:20-24, 207:5-12, 35:17-20) and testified those representations are why she purchased the Glucose Control Products. *Id.* Ex. G, at 136:20-137:24, 207:5-12. Ms. George believed the products would have a "beneficial effect on diabetes." *Id.* at 125:1-8. For example, when asked "What does the phrase "glucose control" mean to you?", Ms. George answered "glucose control means that it helps control the sugar in your body." *Id.* Ex. G, at 77:7-78:15. When asked, she stated she believed the products would "help my diabetes, not to –not to make it go away." *Id.* Ex. G, at 126:5-7. She said she would "probably not" buy the Glucose Control Products again because "it spiked my blood sugar." (*Id.* Ex. G, at 167:22-23, 184:5-7, 202:25-203:3) and "didn't control my glucose." *Id.* Ex. G, at 181: 21-22. The Glucose Control Products spiked her sugar "two, three times" after consumption. *Id.* Ex. G,at 55:8-10, 58:2-7. Because the Glucose Control Products do not control her glucose and spikes her blood sugar, she would like the Products' label changed (*id.* Ex. G, at 182:20-21) and has opted for cheaper products that did not spike her sugar. *Id.* Ex. G, at 54:22-25.

---

[5] This is even true when the label may be subject to multiple interpretations. *Whiteside v. Kimberly Clark Corp.*, 108 F.4th 771, 781 (9th Cir. 2024) ("Contrary to Defendant's suggestion, our cases affirm that a front label is not ambiguous simply because it is susceptible to two possible meanings; a front label is ambiguous when reasonable consumers would necessarily require more information before reasonably concluding that the label is making a particular representation.").

[6] It is also worth noting that only the newer versions of the label had the disclaimer, and it only related to one of the challenged claims ("helps manage blood sugar"). Kashima Decl., Exs. K-O. Prior to 2020, this disclaimer was not on the label. *Id.,* J.

14

Defendant's contention that Ms. George was a "satisfied customer who got exactly what she wanted from Boost" and "delivered on her expectations" is completely contrary to her sworn testimony cited above. Motion pp. 14-15. Nonetheless, her testimony shows Ms. George relied on the representation the Glucose Control Products was "glucose control" "designed" for diabetics and it was misleading because it caused her sugar to spike. Her fact pattern is much different than cases where summary judgment has been granted in favor of a defendant. *See Wilson v. Frito-Lay N. Am., Inc.*, 260 F.Supp.3d 1202, 1215 (N.D. Cal. 2017) (granting summary judgment in part because Plaintiff "testified at his deposition that he did not rely on the 'all natural' label when making his purchasing decision"); *Major v. Ocean Spray Cranberries, Inc.*, No. 5:12-CV-03067-EJD, 2015 WL 859491, at *3 (N.D. Cal. Feb. 26, 2015), *aff'd*, 690 F. App'x 564 (9th Cir. 2017) (granting summary judgment where Plaintiff admitted she did not rely to her detriment on the theory of deception proffered in the complaint).

Additionally, as noted above, the crux of Plaintiffs' claims is that the Glucose Control Products do not have any benefit in controlling blood glucose levels, when compared to other "diet" drinks. Yet, it is marketed as "for diabetics," "Glucose Control" and "helps manage blood sugar." Ms. George relied on these claims, in the belief that the Glucose Control Products would do what their name implies, control glucose levels (not to simply receive a low-sugar product):

Q. What do you think Nestlé is being sued for?

A. The claim, that it -- that it is for diabetics.

Q. And what do you think is wrong about that claim?

A. For something -- in my opinion, if a product I purchase says it is designed for diabetics, it should be better for me than those things that are not.

....

Q. Do you think that BOOST Glucose Control is not better for you than full-sugar nutritional drinks?

MR. BUSCH: Objection to form.

THE WITNESS: I don't buy full-sugar drinks because of diabetes.

Kashima Decl., Ex. G, at 51:24-52:15. Again, Ms. George did not get what she was promised and testified that she was misled.

1    And Ms. George's assertion that products that are "designed for diabetics" should be better

2  than other low-sugar drinks is not unreasonable. ████████████████████████████████████

3  ██████████████████████████████████████████████████████████████████████████████████

4  █████████████████████████████ Kashima Decl., Ex. D at 46:19-47:19, 56:3-57:7, Ex. D, Ex. 4].

5  ██████████████████████████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████████████████ *Id*., Ex. D

7  at 46:19-47:19, 56:3-57:7, Ex. D, Ex. 4] ("█████████████████████████████████████████

8  ██████████████████████████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████████." ). Again, Plaintiffs'

10 testimony shows that they were misled and injured by the Challenges Statements.

### 3.    Stephen Owen

12    Mr. Owen is a Type 2 diabetic who purchased the Glucose Control Products from Amazon.

13 Kashima Decl., Ex. F, at 49:13-15, 77:15-18. Mr. Owen was induced to buy the Glucose Control

14 Products by either a person or a television commercial who "told me it regulates the sugar." *Id*., Ex.

15 Ex. F at 65:2-9. He recalls viewing the label of the Glucose Control Products he purchased (*Id*., Ex. F

16 at 21:1-6) and relied upon the name of the Product, Boost Glucose Control, upon purchase. *Id.* at

17 67:20-22. When asked "why are you suing Nestle," he said "[b]ecause they misrepresented the actual

18 drink. They said it would control sugar and it didn't." *Id*., Ex. F at 17:4-18:2, *see also id.* at 110:7-10

19 ("So what statements on the BOOST labels do you think are misleading? It says controls sugar."). Mr.

20 Owen believed his consumption of the Glucose Control Products would cause his blood sugar to stay

21 steady (*Id., Ex. F at 65: 6-67:2) and his problem with the Glucose Control Products were because "[i]t

22 doesn't control the sugar" but had the name "BOOST Glucose Control" (*id*., Ex. F at 110:7-111:13)

23 and "wasn't helping my sugar" or would not "keep it steady." *Id., Ex. F at 81:7-12, 22-25. Mr. Owen's

24 testimony is summed up by a simple exchange:

25    Q: … And in your own words, what's your understanding of the reason why you're
   here today?

26    A. Trying to get refunds for whoever bought BOOST and change the packaging.

27    Q. Okay. And so in your own words, why are you suing Nestle?

28    A. Because they misrepresented the actual drink. They said it would control sugar and

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

it didn't.

*Id.* at 17:19-18:7, 19: 3-5; *see also id.* at 142:7-143:2, 144:4-17 (Mr. Owen's confirming this understanding of the allegations in the Complaint).

Defendant's contend that Mr. Owen only relied upon "three words (Boost Glucose Control) in isolation, blinding himself to all context." Motion p. 18. While Mr. Owen clearly relied upon the Boost Glucose Control representation, he also looked at the label and understood in the context of the label that it would "control sugar." Kashima Decl., Ex. F at 17:19-18:4, 19:3-5, 21:1-6. Despite Defendant's assertion, he did not ignore "prominent, front-label information" that would render his deception claim fatal. Mr. Owen's testimony is similar to testimony in other cases where summary judgment was denied because there was a disputed fact as to whether a reasonable consumer would be deceived by the product label. *See Schneider v. Chipotle Mexican Grill, Inc.*, 328 F.R.D. 520, 533 (N.D. Cal. 2018) ("[v]iewed in the light most favorable to Plaintiffs, there is a triable issue of fact as to whether a reasonable consumer could find that Chipotle's 'non-GMO' claims implied that the animals that produce Chipotle's meat and dairy ingredients were not fed GMO grain. . . Plaintiffs' have submitted sufficient evidence to present a genuine issue of material fact as to whether Defendant's representations would have deceived a reasonable consumer.").

This case is analogous to *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523 (N.D. Cal. 2012). There, the defendant sought summary judgement because plaintiffs' alleged purchases were undocumented by receipts, neither plaintiff could recall the precise prices they paid or the exact statements on the bottling of the beverages they purchased. *Id.,* at 530. The court denied Defendant's motion for summary judgment because ultimately, these issues were those of weight rather than evidence of an undisputed fact. *Id.* "Such arguments do not establish the absence of a disputed issue of material fact, but are instead about the relative weight of the evidence, and must be presented to the jury. . . [b]oth plaintiffs have testified they incurred economic harm of a dollar or two per purchase, and there is simply no authority to suggest that they must provide a more precise accounting of their losses at this juncture to proceed on their claims." *Id.*, at 530-31 ("Turning to reliance, likewise, defendants may attempt to exploit plaintiffs' imperfect recollections to persuade the trier of fact to discount their testimony, but critically, because plaintiffs specifically recall defendants' representations of Arizona beverages as "natural," and indicate that statement was material to their

purchase, this standing requirement is satisfied.").

Here, Mr. Owen has provided evidence of his purchase (Kashima Decl., Ex. F at 77:15-18), representations he relied upon (*id.* Ex. F at 65:6-66:22 [testifying the he believed that the Products would "regulate the sugar… Keep it steady, it doesn't spike."]), and amount injured (*id.* Ex. F at 19:3-11 [a refund and costs of the litigation]), which disputes all of the facts raised by Defendant in support of its Motion. Any additional examination goes to the weight of the evidence for a jury rather than a disputed fact.

### C.     The Boost Labels Do Make Health Claims Under the FDCA.

Under the FDCA, food manufacturers are prohibited from claiming on their labels that a food expressly, or by implication, "characterizes the relationship of any nutrient… to a disease or a health-related condition." 21 U.S.C. § 343(r)(1)(B). Section 343(r) of the FDCA, together with the governing FDA regulations, outlines requirements for when a party may use "health claims" on food labels. FDA regulations state that such "health claims" are those which "... characterize[ ] the relationship of any substance to a disease or health-related condition." 21 C.F.R. § 101.14(a)(1). "Substance means a specific food or component of food." 21 C.F.R. § 101.14(a)(2). Additionally, "[d]isease or health-related condition" is defined as "damage to an organ, part, structure, or system of the body such that it does not function properly (e.g., cardiovascular disease), or a state of health leading to such dysfunctioning (e.g., hypertension)." 21 C.F.R. § 101.14(a)(5). Health claims must be "complete, truthful, and not misleading." 21 C.F.R. § 101.14(d)(2)(iii).[7]

The FDA notes there is "no 'bright-line' definition that can be established for implied health claims. Labeling claims need to be considered in their entirety and in context to determine if the elements of a health claim are present." Food Labeling; General Requirements for Health Claims for Food, 58 FR 2478 at 2483. An implied health claim includes "those statements, symbols, vignettes, or other forms of communication that suggest, within the context in which they are presented, that a relationship exists between the presence or level of a substance in the food and a disease or health-related condition." *Id.* But, the FDA has made it clear that "Congress intended that health claims do

---

[7] California has expressly adopted the federal labeling requirements as its own. *See* Cal. Health & Safety Code § 110100 ("All food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food labeling regulations of this state.").

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

include disease-specific claims." *Id.* This is true of brand names, as well. For example, the FDA has pointed out that brand names containing words such as "heart" qualifies for an express health claim regarding cardiovascular disease if it "lead[s] consumers to believe that the specific food bearing that brand name has properties deriving from a substance that it contains that are beneficial for reducing the risk of developing a disease or health-related condition." *Id.* This same guidance notes that "labeling would be subject to regulation under section 403(r) of the act if the labeling bears any implication that a substance in the food is helpful in reducing the risk of *diabetes* or any other disease." *Id*. at 2483 ("emphasis added").

This case does not deal with the fuzzy edges of allowable health claims. Defendant correctly points out Plaintiffs claim that the Boost labels make three health claims: (1) "designed for people with diabetes"; (2) the name of the product, "Boost Glucose Control"; and (3) "helps manage blood sugar." Compl. ¶ 34. Despite Defendant's assertions to the contrary, these are health claims. By stating the Glucose Control Products control glucose, helps manage blood sugar, and are ***designed for people with diabetes*** the Glucose Control Products indicate within the context they are presented that there is a beneficial relationship between the amount of sugar in the Glucose Control Products and treating diabetes. All three plaintiffs had a similar understanding of what the Product purported it would do, have a beneficial effect on their diabetes. *See* Kashima Decl., Exs.G, at 125:1-8 (She believed the Glucose Control Products would have a "beneficial effect on diabetes"); F, at 66:20-23 (Mr. Owen believed his consumption of the Glucose Control Products would cause his blood sugar to stay steady); E, at 276:8-11, 27:16-23, 31:6-9 (Mr. Horti believed the Glucose Control Products would "have some impact…more than just what's the sugar level" and "some benefit specifically for diabetics)".

Even worse, Plaintiffs have testified they think they are not truthful health claims. Kashima Decl., Exs. F, at 111:5-7, 81:9-12, 21-23 (did not believe the Glucose Control Products functioned correctly because "[i]t doesn't control the sugar", "wasn't helping my sugar", or would not "keep it steady"); G, at 167:22-23, 184:5-7, 202:25-203:3, 181:21-22. (she would "probably not" buy the Glucose Control Products again because "it spiked my blood sugar". and "didn't control my glucose"); E, at 205:9:11, 207:9-11, 207:3-5 ("[d]esigned for people with diabetes, and—and I'm not sure that's correct". . ."the fact that it says, Glucose control. We don't really know what controls your glucose

either"). Again, Plaintiffs positions are not unreasonable. The FDA, in removing diabetic specific "special dietary use" regulations, noted "that use of label statements identifying specific foods as particularly useful for diabetics is misleading." Revocation of Certain Regulations Affecting Food, 61 FR 27771-01, 27774. At this point in the litigation, there is sufficient evidence to defeat a motion for summary judgment.

Nonetheless, whether the challenged claims are health claims or misleading is ultimately a jury question. *See Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1097 (N.D. Cal. 2017) ("This guidance clearly indicates that a link between fiber and cholesterol is essentially a link to heart disease. Moreover, given that sources such as 'medical texts and other objective sources' are required to determine if a claim implies treatment of disease, it is a factual question whether claims concerning risk factors such as weight loss, blood pressure, and blood sugar also "impl[y] treatment or prevention of [heart] disease.") (analysis of a a violation of 21 C.F.R. §§ 101.14 and 101.71(a)); *Horti*, 2023 WL 8613601, at *1 ("A reasonable consumer could understand these representations to indicate that the product will have a positive effect on diabetes and blood sugar levels. Nestle offers contrary interpretations of the product labels, but that disagreement is not appropriate for resolution on a motion to dismiss").[8]

Defendant's argument that the Challenged Statements are not health claims because they do not specifically state that the Glucose Control Products "reduce[ ] the risk of contracting diabetes among those who do not already have it" is misplaced. Motion p. 20-21. Nothing in the regulatory record, or relevant jurisprudence, states that only those "claim[s] that a substance can reduce the risk of disease or health condition" is a health claim. *Id.* Instead, a plain reading of the statue and regulations at issue provides otherwise, stating that a health claim only requires that a defendant advertise a "*relationship* of any substance to a disease or health-related condition." 21 U.S.C. § 343 (r)(1)(B) (emphasis added); 21 C.F.R. § 101.14(a)(1) ("Implied health claims include those

_____

[8] Additionally, given the underlying reasonable consumer standard, Plaintiffs will likely present expert testimony, including consumer surveys, to establish what a reasonable consumer may believe. *Pettersen v. Circle K Stores*, Inc., No. 321CV00237RBM, 2022 WL 17974463, at *9 (S.D. Cal. Nov. 23, 2022) (a reasonable consumer's beliefs and understanding can be established using expert testimony, consumer surveys, as well as Defendant's own documents); Kashima Decl., ¶ 18. Such expert testimony is premature at this stage of the litigation. This is another reason to deny Defendant's Motion. Fed. R. Civ. Pro. 26(d)

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

statements… that suggest, within the context in which they are presented, that a _relationship_ exists between the presence or level of a substance in the food and a disease or health-related condition.") (emphasis added). Defendant clearly advertises a "relationship" between consuming the Glucose Control Products and mitigating diabetes, including the main consequence of the disease, increased blood sugar levels. Indeed, courts within this District have come to the same conclusion. For example, in _Prescott v. TC Heartland, LLC_, Judge Pitts held that a drink which advertised that it "help[s] manage blood sugar," provide "diabetes care," and are "suitable for people with diabetes" made health claim under section 101.14. _Id.,_ 2024 WL 3463826, at *3 (holding that Plaintiffs' claims are not preempted under the FDCA, because they alleged a violation of both state law and section 101.14). The FDA is also in accord. In a decision on a Qualified Health Claim regarding Chromium Picolinate and Insulin Resistance, the FDA specifically noted that references to "elevated or abnormally high blood sugar level… are states of health leading to disease (type 2 diabetes) and are therefore health-related conditions [under 21 CFR 101.14(a)(5)]."). Qualified Health Claims: Letter of Enforcement Discretion - Chromium Picolinate and Insulin Resistance (Docket No. 2004Q-0144), available at https://www.fda.gov/food/nutrition-food-labeling-and-critical-foods/qualified-health-claims-letters-enforcement-discretion (last visited Feb. 26, 2025).[9]

Indeed, this FDA decision on Qualified Health Claim regarding chromium is particularly relevant here. The FDA specifically rejected the petitioner's request that the FDA authorize a health claim characterizing the relationship between the consumption of chromium picolinate and a reduced risk of, _inter alia_, "abnormally elevated blood sugar levels" and "type 2 diabetes." _Id._ In doing so, the FDA found that "there is not credible evidence to support a claim with respect to chromium picolinate and a reduction of risk for the other disease or health related conditions requested by the petitioner."

---

[9] Defendant's citation to _Whitaker v. Thompson_, 353 F.3d 947 (D.C. Cir. 2004) is inapposite. _Whitaker_ involved whether the marketing of a "saw palmetto" to "improve urine flow, reduce nocturia and reduce voiding urgency associated with mild benign prostatic hyperplasia (BPH)" rendered it a drug or health claim. _Id._ The FDCA defines a "drug" includes "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease." 21 U.S.C. § 321(g)(1)(B). Where as the FDCA defines "health claims" as one that "characterize[ ] the relationship of any nutrient ... to a disease or health-related condition," 21 U.S.C. § 343(r)(1)(B). The _Whitaker_ Court held that because claims can "meets the statutory definitions both of a drug claim _and_ of a health claim," it was not improper for the FDA to apply the strict drug standard. _Id._ at 951-52 ("The existence of dawn and dusk, as has often been said, doesn't make it absurd to distinguish between day and night."). Nevertheless, this is a losing argument for Defendant, whether it is a drug claim, or a "health claim," both are not allowed on food products.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Yet, Defendant's Motion references "chromium" ten times, to justify its "helps manages blood sugar" claims. Essentially, Defendant is just repeating a claim that has already been debunked and prohibited by the FDA. This alone is evidence of the misleading and unlawful nature of Defendant's business practices.[10]

Defendant, finally, contends its disclaimer ("Clinically shown to produce a lower blood sugar response vs. a standard nutritional drink in people with type 2 diabetes. Incorporate into a balanced diet as part of a medically supervised diabetes management plan. [Not a substitute for medication]") precludes finding the claims are issue are health claims. The Ninth Circuit noted:

> We disagree with the district court that reasonable consumers should be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box. The ingredient list on the side of the box appears to comply with FDA regulations and certainly serves some purpose. We do not think that the FDA requires an ingredient list so that manufacturers can mislead consumers and then rely on the ingredient list to correct those misinterpretations and provide a shield for liability for the deception.

*Williams,* 552 F.3d at 939. The disclaimer is not a "get out of jail free" card. Indeed, referencing that the Products should be used as part of a "medically supervised diabetes management plan" may have the opposite effect that Defendant intended. However, the effectiveness of the disclaimer is a question for the jury. *Mariscal v. Graco, Inc.,* 52 F. Supp. 3d 973, 989 (N.D. Cal. 2014) ("[v]iewing this evidence in a light most favorable to Plaintiff, and as adequacy of a warning is usually a question for the jury").

Because all of the claims are health claims without approval of the FDA, misleading, and the disclaimer does not shield Defendant from liability, the Glucose Control Products are misbranded under the FDCA.

**D.    Plaintiffs Can Sustain A FDCA Violation And Have Done So.**

Nothing more is required of their consumer fraud claims under a FDCA violation theory. It is enough if a plaintiff bought a product containing the alleged misrepresentations, plain and simple, *even if* the misrepresentations didn't affect their purchasing decision in any way. *See Bruno v. Quten*

---

[10] Defendant's claim that its Product have specific ingredients that, such as tapioca dextrin and chromium, that "assist with delivering [the advertised] benefit" is also debunked by its own testing. *See* Motion at p. 9. Defendant's clinical studies show that there is no benefit to drinking the Glucose Control Products on blood glucose levels when compared to other "reduced carbohydrate products." Kashima Decl., Ex. D, Ex. 6 at 77; *see also* Loose Decl., Ex. 11. Thus, Defendant's own studies show that it is the carbohydrates levels, and not tapioca, that is associated with the lesser glucose spike.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

*Rsch. Inst., LLC,* 280 F.R.D. 524, 531 (C.D. Cal. 2011) ("The Ninth Circuit reasoned that a concrete injury sufficient for Article III standing was shown by the California UCL's requirement that the plaintiff and class members suffered an economic loss caused by the defendant, namely the purchase of defendant's product containing misrepresentations; *Ries,* 287 F.R.D. at 536 ("The focus of the UCL and FAL is on the actions of the defendants, not on the subjective state of mind of the class members."). The idea here is that simply buying a product that doesn't do what it claims is an automatic economic injury, even if the misrepresentation is irrelevant to the purchaser's usage. *See Hinojos v. Kohl's Corp.,* 718 F.3d 1098, 1104 (9th Cir. 2013), *as amended on denial of reh'g and reh'g en banc* (July 8, 2013). A statement need not be the "'the sole or even the predominant or decisive factor influencing'" the class members' decisions to buy the challenged products. *In re Tobacco II Cases*, 46 Cal. 4th 298, 326 (2009).

Defendants claim that Plaintiffs "have suffered no financial harm" is not supported by the evidentiary record. Motion p. 22; *see also* Kashima Decl., Exs. F at 19:3-5 (testified he's owed a refund for the Glucose Control Products purchased); E at 285:2-5, 46:14 (same); G 54:22-25 (has opted for cheaper products that do not spike her glucose).

While Defendant claims that Plaintiff is only asserting a "technical regulatory violation," which results in no harm, this is not true. Motion p. 22. First, for the reasons stated above, the health claims at issue are misleading, and harmful to both Plaintiffs and other consumers. Nonetheless, this is just a restatement of the argument that was already rejected by the Ninth Circuit, which found:

> Plaintiffs allege that they purchased a product they otherwise would not have bought but for defendant's alleged misrepresentations. The purchase price itself is therefore a "tangible economic injury" and is sufficient at the pleading stage to show the plaintiffs "suffered actual, discrete, and direct injury in fact in the form of financial losses ...." *Nat'l Audubon Soc'y, Inc. v. Davis,* 307 F.3d 835, 855–56 (9th Cir. 2002). Because the plaintiffs claim that they "spent money that, absent defendant['s] actions, they would not have spent," they have pleaded "a quintessential injury-in-fact"

*Horti*, 2023 WL 8613601, at *1. This differentiates this case from those cited by Defendant, *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) and *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016). In *TransUnion LLC* the Court held that inaccurate credit files, which were never disseminated, but violated the Fair Credit Reporting Act ("FCRA"), was not a sufficient injury. *TransUnion LLC,* 594 U.S. at 437-39. As the Supreme Court noted, "'if inaccurate information falls into' a consumer's credit

1  file, 'does it make a sound?'" *Id*., at 433. Similarly, *Spokeo, Inc.* held that the dissemination of an
2  incorrect zip code, in violation of the FCRA, without more, is not a concrete harm. *Spokeo, Inc.,* 578
3  U.S. at 342-43. Overpaying for a misrepresented or misbranded product is not the same as these
4  "harmless" violations of the FCRA. *Horti*, 2023 WL 8613601, at *1.

5  **V.    CONCLUSION**

6          For the reasons stated herein, Plaintiffs respectfully request that the Court deny Defendant's
7  Motion, and allow the merits of their claims to be decided by the trier of fact, with the benefit of expert
8  discovery.[11]

9

10                                        Respectfully submitted,

10          DATED: March 4, 2025              By: /s/ *Trenton R. Kashima*
11                                                Trenton R. Kashima

12                                            Trenton R. Kashima (SBN 291405)
13                                            **MILBERG COLEMAN BRYSON**
                                              **PHILLIPS GROSSMAN PLLC**
13                                            402 W. Broadway, Suite 1760
14                                            San Diego, CA 92102
                                              Telephone: (619) 810-7047
15                                            Email: *tkashima@milberg.com*

16

17                                            Nick Suciu III (*pro hac vice*)
                                              **MILBERG COLEMAN BRYSON**
18                                            **PHILLIPS GROSSMAN, PLLC**
                                              6905 Telegraph Rd., Suite 115
19                                            Bloomfield Hills, MI 48301
                                              Telephone.: (313) 303-3472
20                                            Facsimile: (865) 522-0049
                                              Email: *nsuciu@milberg.com*

21                                            J. Hunter Bryson (*pro hac vice*)
22                                            **MILBERG COLEMAN BRYSON**
                                              **PHILLIPS GROSSMAN PLLC**
23                                            405 E. 50th Street
                                              New York, NY 1002
24                                            Telephone: (919) 539-2708
                                              Facsimile: (919) 600-5035
25                                            Email: *hbryson@milberg.com*

26

27

28

---

[11] Plaintiffs concede judgment on the Injunctive Relief claims.

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

DATED: March 4, 2025                By: /s/ Laurence D. King
                                          Laurence D. King

                                    Laurence D. King (SBN 206423)
                                    Matthew B. George (SBN 239322)
                                    Blair E. Reed (SBN 316791)
                                    Clarissa Olivares (SBN 343455)
                                    **KAPLAN FOX & KILSHEIMER LLP**
                                    1999 Harrison Street, Suite 1560
                                    Oakland, CA 94612
                                    Telephone: 415-772-4700
                                    Facsimile: 415-772-4707
                                    Email: *lking@kaplanfox.com*
                                           *mgeorge@kaplanfox.com*
                                           *breed@kaplanfox.com*
                                           *colivares@kaplanfox.com*

                                    Joel B. Strauss (*pro hac vice*)
                                    **KAPLAN FOX & KILSHEIMER LLP**
                                    800 Third Avenue, 38th Floor
                                    New York, NY 10022
                                    Telephone: 212-687-1980
                                    Facsimile: 212-687-7714
                                    Email*: jstrauss@kaplanfox.com*

                                    Michael D. Braun
                                    **KUZYK LAW, LLP**
                                    1999 Avenue of the Stars, Ste. 1100
                                    Los Angeles, CA 90067
                                    Telephone: 213-401-4100
                                    Email: *mdb@kuzykclassactions.com*

                                    Ross B. Rothenberg (*pro hac vice*)
                                    **THE ROTHENBERG LAW FIRM LLP**
                                    450 7th Avenue, 44th Floor
                                    New York, NY 10123
                                    Telephone: 212-563-0100
                                    Email: *ross@injurylawyer.com*

                                    *Co-Lead Interim Counsel for Plaintiffs and the
                                    Proposed Class*

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT